442 A.2d 661

In re REAPPORTIONMENT PLAN FOR the PENNSYLVANIA GENERAL ASSEMBLY filed by the Legislative Reapportionment Commission, October 13, 1981.*

W. D. Misc. Docket Nos. 331, 333, 337, 339, 342, 343, 346–348, 1981.

M. D. Misc. Docket Nos. 118 and 119, 1981.

E. D. Misc. Docket Nos. 535, 542, 556, 558, 584, 588, 590, 591, 594–597, 599, 601, 602, 605–607, 1981.

Supreme Court of Pennsylvania.

Argued Dec. 7, 1981.

Decided Dec. 29, 1981.

Reargument Denied Jan. 18 and Jan. 29, 1982.

* Appeals of:

Edward E. Stevens, et al., at No. 331 W. D. Misc. Docket, 1981.
J. Howard Womsley, et al., at No. 333 W. D. Misc. Docket, 1981.
Samuel L. McPherson, et al., at No. 337 W. D. Misc. Docket, 1981.
Michael Dawida, at No. 339 W. D. Misc. Docket, 1981.
John R. Bonassi, et al., at No. 342 W. D. Misc. Docket, 1981.
The Republican Legislator of Allegheny County, The 28th Legislative District, Rep. George Pott, at No. 343 W. D. Misc. Docket, 1981.
Borough of Wesleyville, at No. 346 W. D. Misc. Docket, 1981.
Borough of Glassport, at No. 347 W. D. Misc. Docket, 1981.
The Republican Legislator of Butler County, the 12th Legislative District, Rep. James M. Burd, at No. 348 W. D. Misc. Docket, 1981.
Common Cause, Thomas D. DeWall and Terry K. Wheeler, at No. 118 M. D. Misc. Docket, 1981.
William P. Feuchtenberger, et al., at No. 119 M. D. Misc. Docket, 1981.

Richard A. Tilghman, at No. 535 E. D. Misc. Docket, 1981.
Kathleen Brescia, et al., at No. 542 E. D. Misc. Docket, 1981.
The Chestnut Hill Community Assoc., et al., at No. 556 E. D. Misc. Docket, 1981.
The Republican City Committee of Philadelphia, et al., at No. 558 E. D. Misc. Docket, 1981.
Committee to Save the 189th Legislative District, et al., at No. 584 E. D. Misc. Docket, 1981.
Mark Cohen, State Representative, et al., at No. 588 E. D. Misc. Docket, 1981.
Robert E. Paul, at No. 590 E. D. Misc. Docket, 1981.
Township of Marple and Jack E. Lantrip, at No. 591 E. D. Misc. Docket, 1981.
Committee for Fair Reapportionment, et al., at No. 594 E. D. Misc. Docket, 1981.
West Mt. Airy Neighbors, Inc., at No. 595 E. D. Misc. Docket, 1981.
Representative John Alden, at No. 596 E. D. Misc. Docket, 1981.
Wilfredo P. Rojas, et al., at No. 597 E. D. Misc. Docket, 1981.
Township of Ridley, et al., at No. 599 E. D. Misc. Docket, 1981.
Schuylkill County Republican Organization, et al., at No. 601 E. D. Misc. Docket, 1981.
Senator Philip Price, Jr., et al., at No. 602 E. D. Misc. Docket, 1981.
Charles D. Snelling, at No. 605 E. D. Misc. Docket, 1981.
John L. Butler, at No. 606 E. D. Misc. Docket, 1981.
Edwin G. Holl, et al., at No. 607 E. D. Misc. Docket, 1981.
The appeals at Nos. 591 and 596 E. D. Misc. Docket, 1981, have been discontinued.

Larry B. Selkowitz, Camp Hill, Andrew S. Ross, Harrisburg, for Common Cause et al. in No. 118.

John H. Broujos, Carlisle, for William P. Feuchtenberger et al. in No. 119.

James W. Dunn, Jr., Pittsburgh, for J. Howard Womsley et al. in No. 333.

Samuel J. Reich, Terry L. Jordan, Pittsburgh, for Edward E. Stevens, etc., et al. in No. 331.

John R. Luke, Pittsburgh, for Samuel L. McPherson, etc., in No. 337.

Donald R. Walko, Jr., Pittsburgh, for Michael Dawida in No. 339; Michael Dawida, in pro. per.

Donald Lee, Pittsburgh, for John R. Bonassi et al. in No. 342.

George Pott, in pro. per.

Larry B. Selkowitz, Camp Hill, for Borough of Wesleyville in No. 346.

Timothy P. O'Reilly, Pittsburgh, for Borough of Glassport in No. 347.

James M. Burd, in pro. per.

Jeffrey L. Pettit, Perrin C. Hamilton, Philadelphia, for Richard A. Filghman in No. 535.

Harvey Bartle, III, Harrisburg, for Kathleen Brescia, etc., in No. 542.

Peter C. Paul, Philadelphia, for Chestnut Hill Community Ass'n et al. in No. 556.

Louis W. Fryman, William A. Meehan, Philadelphia, for Republican City Committee of Philadelphia, etc., et al. in No. 558.

James L. J. Pie, in pro. per., for Committee to Save the 189th Legislative Dist. et al. in No. 584.

P. Stephan Lerario, Philadelphia, for Mark Cohen et al. in No. 588.

Robert E. Paul, in pro. per.

Edward V. Schulgen, Philadelphia, for Committee for Fair Reapportionment, etc., in No. 594.

Ralph David Samuel, Philadelphia, for West. Mt. Airy Neighbors, Inc., in No. 595.

Robert J. Mulligan, Jr., Harrisburg, for Wilfredo P. Rojas et al. in No. 597.

Peter J. Rohana, Jr., Springfield, for Ridley Tp. et al. in No. 599.

William T. Smith, Harrisburg, Joseph McKenna, Pottsville, for Schuylkill County Republican Organization et al. in No. 601.

Gregory M. Harvey, Philadelphia, for Philip Price, Jr., et al. in No. 602.

Gregory M. Harvey, Philadelphia, Robert Sullivan, Jr., Lebanon, for Charles D. Snelling in No. 605.

John L. Butler in pro. per.

Paul E. Holl, Lansdale, for Edwin G. Holl, etc., in No. 607.

Thomas N. O'Neill, Jr., Philadelphia, for Legislative Reapportionment Commission.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

These are consolidated appeals from the Final Legislative Reapportionment Plan, which was filed by the Pennsylvania Legislative Reapportionment Commission on October 13, 1981. For the reasons set forth, we hold that the reapportionment plan complies with all of the requirements of the United States Constitution and the Constitution of this Commonwealth.

The plan challenged on these appeals is the second reapportionment plan to be adopted by the Legislative Reapportionment Commission, which, since 1968, has been constitutionally vested with the obligation to reapportion the legislative districts of the Commonwealth "[i]n each year following that in which the Federal decennial census is officially reported." Pa.Const. art. II, § 17(a).[1] Pursuant to the

---

1. The Commission's first reapportionment plan, which has been in effect during the past ten years, was adopted in 1971 and upheld as constitutional by this Court in *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15, appeal dism'd for want of substantial federal question, 409 U.S. 810, 93 S.Ct. 44, 34 L.Ed.2d 65 (1972).

Prior to the 1968 amendment to the Pennsylvania Constitution, which for the first time provided for a Legislative Reapportionment Commission, the Constitution assigned the task of reapportionment to the full General Assembly. In the event that the General Assembly did not adopt a reapportionment plan within the time required, this Court had the obligation to devise an appropriate plan, an obligation which this Court assumed in 1965. See *Butcher v. Bloom (Butcher II)*, 420 Pa. 305, 216 A.2d 457 (1966) and *Butcher v. Bloom (Butcher I)*, 415 Pa. 438, 203 A.2d 556 (1964). Thus, this Court is

Constitution, the Commission consists of five members who act by majority vote: the majority and minority leaders of both the Senate and House of Representatives (or deputies appointed by each of them), and a chairman who is selected either by the other four members of the Commission or, if the four Commission members are unable to do so within the time prescribed, by this Court. Pa.Const. art. II, § 17(b). The present Legislative Reapportionment Commission, which consists of the majority and minority members of each house and a chairman selected by them, unanimously adopted the Final Legislative Reapportionment Plan now before this Court for review.

■ Appellants appeal pursuant to Pa.Const. art. II, § 17(d), which provides that "any aggrieved person may file an appeal from the final plan directly to the Supreme Court within thirty days after the filing thereof." Pursuant to that same constitutional provision, appellants have the burden of establishing "that the final plan is contrary to law." See *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 19, 293 A.2d 15, 24 (1972), appeal dism'd for want of substantial federal question, 409 U.S. 810, 93 S.Ct. 44, 34 L.Ed.2d 65 (1972).[2]

I

■ The law which governs these appeals and circumscribes this Court's review of the Commission's Final Legislative Reapportionment Plan is set forth in Article II, Section 16 of the Pennsylvania Constitution and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. In interpreting the Equal Protection Clause, the Supreme Court of the United States has repeatedly recognized that reapportionment "is

well aware of the difficulties and complexities involved in the drafting of a state-wide reapportionment plan.

2. It has been asserted that the Commission failed to submit a proper record of its proceedings to this Court. We have considered the materials submitted by the Commission in light of Pa.Const. art. II, § 17(h), and are satisfied that the Commission has fulfilled its constitutional responsibility in this regard.

primarily a matter for legislative consideration and determination." *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964). Accord, e.g., *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Ely v. Klahr*, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). In addressing the limited, constitutional nature of judicial review of reapportionment matters, the Supreme Court of the United States has rejected a litigant's claim that a state reapportionment plan should be invalidated merely because the alternative plan proposed by the litigant is a "better" one:

"And what is to happen to the Master's plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point? Involvement like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard.

The point is, that such involvements should never begin. We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it."

*Gaffney v. Cummings*, supra, 412 U.S. at 750–51, 93 S.Ct. at 2330. Thus, to prevail in their challenge to the final reapportionment plan, appellants have the burden of establishing not, as some of the appellants have argued, that there exists an alternative plan which is "preferable" or "better," but rather that the final plan filed by the Pennsylvania Reapportionment Commission fails to meet constitutional requirements.

The principle that reapportionment is a legislative function is evident from the plain language of this state's Constitution. Article II, Section 17(d) directs not only that the Legislative Reapportionment Commission file a reapportionment plan but also that, in the event a final plan is determined by this Court to be invalid, the plan be remanded

to the Commission for a second attempt at reapportion-
ment.[3] As this Court stated in *Commonwealth ex rel. Spec-
ter v. Levin*, 448 Pa. 1, 7, 293 A.2d 15, 17–18 (1972), the
constitutional delegation of responsibility for reapportion-
ment to the Legislative Reapportionment Commission is
designed to retain "the Legislature's expertise in reappor-
tionment matters."

## II

■ The constitutional requirements which govern this
Court's review are set forth in detail in *Commonwealth ex
rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15 (1972), where
this Court reviewed, and sustained as constitutional, the
1971 reapportionment plan, the first to be effectuated under
Article II, Section 16 of the Pennsylvania Constitution. In
*Specter*, this Court made clear that the federal constitution-
al requirement of equal protection, which mandates " 'that a
State make an honest and good faith effort to construct
districts, in both houses of its Legislature, as nearly of equal
population as is practicable,' "[4] is incorporated as a matter
of state constitutional law in Article II, Section 16, which
provides that districts be "composed of compact and contigu-
ous territory as nearly equal in population as practica-
ble. . . ." In *Specter*, this Court also made clear that, as a
matter of both federal and state law, equality of population
must be the controlling consideration in the apportionment
of legislative seats. As the Supreme Court of the United
States has stated,

"the basic principle of representative government remains,
and must remain, unchanged—the weight of a citizen's
vote cannot be made to depend on where he lives. Popu-

**3.** The Constitution provides that the Supreme Court shall "proceed
on its own motion to reapportion the Commonwealth" only "[i]f a
preliminary, revised or final reapportionment plan is not filed by the
commission within the time prescribed by this section, unless the
time be extended by the Supreme Court for cause shown . . . ."
Pa.Const. art. II, § 17(g).

**4.** 448 Pa. at 7, 293 A.2d at 18, quoting *Reynolds v. Sims*, 377 U.S.
533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

lation is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies."

*Reynolds v. Sims*, 377 U.S. at 567, 84 S.Ct. at 1384 (footnote omitted).

■ The Final Legislative Reapportionment Plan reflects the Legislative Reapportionment Commission's adherence to the goal of equal population among legislative districts. When the population of the Commonwealth is divided by the 50 seats constitutionally mandated for the Senate and the 203 seats constitutionally mandated for the House of Representatives, the ideal district of "one person, one vote" is composed of 237,334 people for the Senate and 58,456 people for the House.[5] Under the final plan of the Legislative Reapportionment Commission, the range of deviation between the highest and lowest populated districts is only 1.9% from the ideal Senate district and 2.8% from the ideal House district. There is no doubt that this plan, which more nearly achieves the goal of equal population than did the 1971 reapportionment plan in *Specter*, satisfies equal protection requirements. Indeed, as is demonstrated by the table contained in the accompanying footnote, the final plan achieves an equality of population among legislative districts closer to the constitutional ideal of "one person, one vote" than any previous reapportionment plan in the history of the Commonwealth.[6]

5. The total population of the Commonwealth is 11,866,728.

6. Total Percentage Deviation From Ideal District Population.
 (Ideal in parentheses)

| | Senate | House |
|------|--------|-------|
| 1981 | 1.93% | 2.81% |
| | (237,334) | (58,456) |
| 1971 | 4.31% | 5.46% |
| | (235,949) | (58,113) |
| 1966 | 19.6% | 30.04% |
| | (226,387) | (56,597) |

## III

Appellants contend that the Final Legislative Reapportionment Plan goes too far toward achieving the constitutional goal of "one person, one vote" and, in so doing, fails to achieve the additional state constitutional goals of Article II, Section 16, that districts be compact, and that no political subdivision be divided unnecessarily. Article II, Section 16 provides in full:

"Legislative districts

The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district." [7]

### A.

Appellants' argument is based on the premise that the goals of compactness and maintenance of political subdivisions are as important as the goal of maximum population equality among districts. Thus, appellants argue, district deviations from compactness and subdivision boundaries are constitutionally permissible only if these deviations are absolutely necessary to survive federal equal protection analysis.

Contrary to appellants' premise, this Court has held that the state constitutional mandate that districts be "as nearly of equal population as is practicable" requires that "the object of any reapportionment plan must be substantial equality of population" and that, if need be, the concerns for compactness and adherence to political subdivision lines must yield to this "overriding objective." 448 Pa. at 13, 293

---

7. We are satisfied that no violation of the constitutional mandate of contiguity is presented on these appeals. The one claim of non-contiguity that is raised, at No. 535, was not presented to the Commission.

A.2d at 21. In *Specter*, where the Court was first called upon to interpret Article II, Section 16 of the Constitution, we looked not only to federal constitutional principles but also to the language of the Pennsylvania Constitution. This Court recognized that, with a fixed number of legislative seats to be apportioned "as nearly equal in population as practicable" and a "population density of this state [that] is quite uneven," in any apportionment scheme there is a "certain degree of unavoidable noncompactness" and a "certain amount of subdivision fragmentation [that] is inevitable." *Specter*, 448 Pa. at 17–18, 293 A.2d at 23.

## B.

Appellants rely upon decisions of the Supreme Court of the United States rendered since *Specter* that have upheld state reapportionment plans with greater district deviations from the ideal population than in *Specter* or in this case. See, e.g., *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). Appellants argue that, because a greater deviation from the population ideal than exists in the final plan would constitute "substantial equality of population" under federal equal protection standards, that greater deviation must define Pennsylvania's standard for substantial equality of population. According to appellants, it is constitutionally impermissible to create districts that more closely approach the ideal of "one person, one vote" if to do so would also render districts more noncompact and divide more political subdivisions.

■ Appellants' argument disregards the critical fact that adherence to a percentage deviation that is at the outside limits of constitutionality cannot be squared with the overriding constitutional objective of "substantial equality of population" among districts. The Pennsylvania Constitution plainly states that districts shall be "as nearly equal in population as practicable." Thus, the clear constitutional directive is that reapportionment shall strive to create districts as equal, not as unequal, as possible. As this Court has stated,

" 'if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired.' "

*Specter*, 448 Pa. at 9, 293 A.2d at 19, quoting *Reynolds v. Sims*, 377 U.S. at 581, 84 S.Ct. at 1391.

Moreover, there is no predetermined percentage deviation from the ideal of "one person, one vote" that satisfies the federal constitutional requirement of "substantial equality of population." As the Supreme Court of the United States has stated, "[w]hat is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." *Reynolds v. Sims*, 377 U.S. at 578, 84 S.Ct. at 1390. Accord, *Mahan v. Howell*, 410 U.S. 315, 328–29, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973) ("citations to numerous cases decided by state and lower federal courts [are] of limited use in determining the constitutionality of Virginia's statute"); *Swann v. Adams*, 385 U.S. 440, 446, 87 S.Ct. 569, 573, 17 L.Ed.2d 501 (1967) ("fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State").

■ Nor can appellants prevail on the theory that this Court should review the final plan of the Legislative Reapportionment Commission to determine whether there is a standard of population deviation greater than that adopted by the Commission, but less than the maximum deviation permissible under the federal Constitution, which would more closely achieve the goals of compactness and undivided political subdivisions. As the Court of Appeals of New York recognized in dismissing a similar claim, the role of the Court in reviewing a reapportionment plan is not to substitute a more "preferable" plan for that of the Commission, but only to assure that constitutional requirements have been met. See *Schneider v. Rockefeller*, 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972).

The invalidity of appellants' premise that there is a predetermined percentage deviation with which any reapportionment plan must comply is evident from the disruptive effect such a theory would have on the respective roles of the Legislature and the Court in reapportionment. Under appellants' approach, the Court—rather than the legislative branch as represented by the Legislative Reapportionment Commission—would have the ultimate responsibility of deciding the precise mathematical formula to be applied in dividing the population of the state among legislative districts. This usurpation of the legislative function would not only be inappropriate but also might well interfere with the Commission's ability to achieve the goals of compactness and preservation of subdivision lines with which appellants are concerned.

## IV

It is well settled that, "in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole." *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 735 n.27, 84 S.Ct. 1459, 1473 n.27, 12 L.Ed.2d 632 (1964). We conclude that the Final Legislative Reapportionment Plan reflects a constitutionally permissible judgment on the part of the Commission that the deviations from mathematical compactness and political subdivision boundaries contained in the plan are necessary to achieve the overriding constitutional goal of districts "as equal in population as practicable."

With a constitutional mandate· that there shall be 50 Senate districts and 203 House districts it is inevitable that some of the State's 67 counties and 2,569 municipalities, with their widely divergent populations, must be divided among legislative districts. Yet, even with this large number of disparately populated political subdivisions and the closest adherence in the history of the Commonwealth to the ideal

of "one person, one vote," the Commission's Senate Plan has preserved the boundaries of 41 counties and all but two municipalities. So too, with the ideal population of a House district set at 58,456, a figure far exceeded by the populations of numerous counties and municipalities, the House Plan has nonetheless preserved the boundaries of 19 counties and all but 87 municipalities. None of the arguments presented by appellants convinces us that the drawing of district lines, which necessarily involves value judgments by the Commission, has been based upon impermissible considerations. Mere dissatisfaction with the fact that certain political subdivisions have been divided or have been included within particular legislative districts is not sufficient to invalidate the Final Reapportionment Plan as unconstitutional. Moreover, the Supreme Court of the United States has made clear that "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation." *Reynolds v. Sims*, 377 U.S. at 579–80, 84 S.Ct. at 1391 (1964).

 Allegations that districts have been the subject of gerrymandering to dilute the voting strength of minorities are not supported. A reapportionment plan may be invalid because it fences out a racial or ethnic group "so as to deprive them of their pre-existing municipal vote," *Gomillion v. Lightfoot*, 364 U.S. 339, 341, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960), or because it operates "to minimize or cancel out the voting strength of racial or political elements of the voting population," *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). See *Gaffney v. Cummings*, 412 U.S. at 751, 93 S.Ct. at 2330. To sustain a constitutional claim that district lines have been racially or ethnically gerrymandered, it is essential to prove a discriminatory purpose. It must be proved that the challenged plan was "conceived or operated as [a] purposeful [device] to further racial discrimination." *Whitcomb v. Chavis*, 403

U.S. 124, 149, 91 S.Ct. 1858, 1872 (1971). Such proof is utterly absent here.[8]

## V

Thus, we are satisfied that, as in 1971, this Commonwealth's Legislative Reapportionment Commission has utilized the relevant population data to fashion a legislative districting plan in full compliance with both the Constitution of the United States and the Constitution of this Commonwealth. Accordingly, by the mandate of Article II, Section 17(e) of the Pennsylvania Constitution, the Final Plan of the Commission, filed October 13, 1981, shall have the force of law, and shall be used in all forthcoming elections to the General Assembly until the next constitutionally mandated reapportionment shall be approved.

Plan in compliance.

NIX and LARSEN, JJ., file dissenting opinions.

KAUFFMAN, J., files a dissenting opinion in which LARSEN, J., joins.

NIX, Justice, dissenting.

I accept the view that reapportionment is essentially a legislative function and that the Commission's judgment should be given at least the deference that a statute enacted by the legislature receives. *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973). I also agree that there must be an honest and good faith effort to design the legislative districts in a fashion that provides an equality of population to insure the vote of the individual. *Reynolds v. Simms*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15 (1972). My concern with the instant plan is that it appears to have

8. The contention that districts have been the subject of gerrymandering to favor incumbents is similarly not substantiated. Indeed, the very structure of the Legislative Reapportionment Commission, constitutionally designed to include the leaders of both major political parties and a neutral chairman, guards against this form of favoritism.

become so dedicated to the latter principle that it ignored the other constitutional considerations which were also designed to facilitate the functioning of a representative form of government. *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). Although we do not dismiss a plan because "fortuitously" another may have constructed a better one, the fact that a better one may be easily designed which accommodates all of the constitutional concerns may strongly suggest the constitutional invalidity of the selected plan.

From the plan submitted and the alternatives suggested, it appears that the Commission could have given due deference to the principle of "one person one vote" and, nevertheless, accorded meaningful expression to the provision which provides:

§ 16. Legislative districts

The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.

Pa.Const.Art. II, § 16.

Comparing the number of "splits" of county and municipal lines under the present proferred scheme (Senate 45: House 235) with that approved in *Specter*, (Senate 36; House 169), it is clear that the concerns of Article II, Section 16 have not been given sufficient consideration.

In addition, I believe the requirements of contiguous and compact districts goes beyond a geographical concern, and it also embraces the concept of a homogeneity of the district, Cf. *Gaffney v. Cummings, supra.*, to facilitate the functioning of a representative form of government particularly in smaller units such as state representative districts. *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973);

*Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

I would remand the plan to the Commission for the purpose of reconsideration and redrafting in such a form that all of the constitutional concerns are addressed.

LARSEN, Justice, dissenting.

Article II, § 16 of the Pennsylvania Constitution provides that *"[u]nless absolutely necessary* no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district." (Emphasis supplied.) Despite the unequivocal language of this constitutional requirement, both the Commission and the majority, in their relentless pursuit of population equality, have nullified this requirement by elevating equality of population from an "overriding objective" [1] to the sole consideration of reapportionment, and have wholly ignored the facts alleged by the various petitioners in this case. Because I believe that the Commission's plan is thus contrary to law, I dissent.

## I.

Complete population equality in reapportionment has never been a constitutional requirement: "substantial equality of population" permits some deviation from ideally populated districts, so long as that deviation is based upon a rational state policy, such as the preservation of political subdivisions. *See Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[2]

---

**1.** This Court has recognized that the "overriding objective" under equal protection is "substantial equality of population." *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 7, 293 A.2d 15, 18 (1972).

**2.** As the United States Supreme Court has stated:

So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in ... a bicameral state legislature.

Deviations from the ideal may be substantially larger than the deviations in the Commission's plan. In *Commonwealth ex rel. Specter v. Levin, supra*, this Court found that a deviation of 4.31% from the ideal senatorial district, and a deviation of 5.46% from the ideal legislative district, "fully achieves the constitutionally-mandated overriding objective of substantial equality of population." 448 Pa. at 16, 293 A.2d at 22. One year later, the United States Supreme Court, in upholding a 16-odd percent deviation in Virginia's legislative reapportionment plan, concluded that population disparities which maintain the integrity of political subdivision lines are "within tolerable constitutional limits." *Mahan v. Howell, supra* 410 U.S. at 329, 93 S.Ct. at 987.

## II.

The following cases presented for this Court's review reveal the consequences of achieving population equality at the expense of political subdivision integrity.

### *City of Pottsville*

It is uncontradicted that Pottsville is the only third class city in Schuylkill County; that Pottsville is the county seat of Schuylkill County; and that Pottsville has, for the last ten years, remained intact as part of a single representative district. In addition, an alternate plan was proposed to the Commission which would not require splitting Pottsville and which would still result in substantial population equality.

*Reynolds v. Sims*, 377 U.S. 533, 579, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

The United States Supreme Court has further held that "[t]he policy of maintaining the integrity of political subdivision lines in the process of reapportioning a state legislature . . . is a rational one." *Mahan v. Howell*, 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973). *See also Reynolds v. Sims, supra* 377 U.S. at 580, 84 S.Ct. at 1391 ("A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions.").

To say that Pennsylvania's policy of maintaining the integrity of political subdivisions in the reapportionment process is rational is an understatement; in fact, such a policy is constitutionally mandated, and may not be avoided "unless absolutely necessary."

Nevertheless, the Commission's plan divides Pottsville between two different representative districts without any showing of necessity.

*Cumberland County*

According to the alternate plan which Cumberland County presented for the Commission's consideration, that county could be kept intact and divided into three representative districts with a maximum deviation of only 4.3% from the ideal. Within those three districts, only one municipality would need to be split in order to ensure substantial equality of population.

Nevertheless, the Commission's plan splits Cumberland County and combines portions of it with portions of York, Adams and Perry Counties to form four representative districts. In addition, within Cumberland County, the Commission's plan splits two townships—South Middleton and North Middleton—and places portions of each into different representative districts.

*Allegheny County*

Pursuant to the Commission's plan, the municipalities of Scott Township, Bethel Park Borough, White Oak Borough, Indiana Township and Carnegie have each been divided between two representative districts; the Town of McCandless has been parceled into three different representative districts, despite the fact that for the past ten years the entire town has been part of a single representative district; the Borough of Baldwin has also been split between three representative districts; and the 16th Ward and the neighborhood of Brookline in the City of Pittsburgh have each been split between two representative districts.

. As the alternate plans submitted to the Commission demonstrate, however, it is not necessary to divide these communities in order to achieve substantial population equality: one alternate plan would place the entire municipalities of Scott Township, Bethel Park Borough, White Oak Borough, Indiana Township, Carnegie and the Town of McCandless into representative districts without any splits and with a

maximum deviation of just 3% from the ideal; yet another would preserve the integrity of the 16th Ward, the neighborhood of Brookline, and Baldwin Borough with a maximum deviation of just 1.38% from the ideal.

### Philadelphia County

Despite the obviously different interests between residents of the City of Philadelphia and their suburban neighbors in adjacent counties, the Commission's plan splits Philadelphia County and places 26,000 Philadelphia residents into a senatorial district along with portions of Delaware and Montgomery Counties.

The Commission has failed to allege any necessity for removing these Philadelphia residents from their city and county for purposes of state senate representation, and has disregarded an alternate proposal which would have kept Philadelphia County whole and still resulted in a maximum deviation of only 2% from the ideal in each of the three affected counties.

### City of Philadelphia

Of the 66 wards in Philadelphia, the Commission's plan splits 39 wards into a total of 51 sections in order to form equally populated districts. In addition, the neighborhoods of Chestnut Hill and Mt. Airy have each been divided between two new representative districts, and the neighborhood of Roxborough has been split among three representative districts. Finally, numerous petitioners have alleged the existence of racial and ethnic discrimination in wards and districts where new ward splits occasioned by the Commission's plan will reduce current black and Hispanic majorities to minorities.

As with the areas cited above, the Commission has offered no showing of necessity, much less "absolute necessity," for splitting the wards and neighborhoods in which petitioners reside, despite the fact that several plans, each of which preserves ward and neighborhood integrity and maintains substantial population equality, were offered for the Commission's consideration.

III.

Each of the political subdivisions sought to be protected by Article II, § 16 of the state constitution has unique interests: state law grants counties control over such areas as local court administration, mental health and mental retardation programs, taxation, transportation, and smaller community health and welfare services; cities like Philadelphia, the state's only first class city, and Pottsville, the only third class city in Schuylkill County, have statutory rights and duties different from the rights and duties of the smaller communities surrounding them; and boroughs, townships, towns, wards and neighborhoods are comprised of racial and ethnic groups with common interests in the economic, residential, recreational and educational betterment of their communities.

The immediate consequences of the Commission's plan are clear: once political subdivisions have been split, there is little chance that the interests of their residents will be represented effectively so long as their elected representatives also represent other areas with different interests, and so long as more than one representative must represent a single area which has been divided among two, three or even four districts. There is also less chance that a particular racial or ethnic group within a split area will be able to elect one of its members to represent its interests so long as the splits required by the Commission's plan reduce a single majority to two or more minorities in separate districts. Thus, the Commission's plan will actually deny numerous political subdivisions and their constituent racial and ethnic populations effective representation in the state legislature, despite the plan's *numerical* adherence to the ideal of "one person, one vote."

Consideration of these interests and the alternate plans proposed by the petitioners in this case would not result in the mere substitution of another plan for the one already submitted by the Commission; rather, it would simply result in giving effect to *each* portion of Article II, § 16 of the Pennsylvania Constitution, a mandate which neither the Commission nor the majority has carried out in this case.

I would, therefore, remand the plan to the Commission with instructions to reapportion the above areas in accordance with *all* the requirements of Article II, § 16 of the state constitution.

KAUFFMAN, Justice, dissenting.

While I cannot, on the sparse record before us, conclude that the Final Plan filed by the Legislative Reapportionment Commission ("Commission") is unconstitutional, I must dissent from the majority opinion upholding the Plan.

The Constitution of this Commonwealth mandates three criteria, all of which must be adhered to in the reapportionment of legislative districts: (1) districts must be compact and contiguous, (2) districts must be as nearly equal in population as practicable, and (3) no political subdivision or ward shall be divided unless *absolutely necessary.* Pa.Const. art. 2, § 16.[1]

For this Court to be nothing more than the Commission's rubber stamp would deprive aggrieved persons of their express Constitutional right of direct appeal from the Final Plan. Pa.Const. art. 2, § 17(d). Although I recognize that our Constitution imposes the burden upon any appellant to establish that the Final Plan is "contrary to law," the numerous challenges now before us at the very least make out a *prima facie* case that all of the constitutional requirements have not been observed. The Commission *appears* to have unnecessarily exalted the interest in absolute mathematical equality of population in the districts above both the requirement of compactness and the proscription against splitting political subdivisions unless *absolutely necessary* to

---

1. Section 16 provides:
 The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, *which shall be composed of compact and contiguous territory as nearly equal in population as practicable.* Each senatorial district shall elect one Senator, and each representative district one Representative. *Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided* in forming either a senatorial or representative district.
 Pa.Const. art. 2, § 16 (Emphasis supplied).

do so.[2] While our decisions recognize that "in any reapportionment scheme 'the overriding objective must be *substantial* equality of population,'"[3] the Commission may not pursue *only* the interest in numerical equality, while disregarding the other legitimate, constitutionally-mandated objectives of reapportionment. *See Reynolds v. Sims,* 377 U.S. 553, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964); *Specter v. Levin,* 448 Pa. 1, 8, 293 A.2d 15, 18 (1972).

Once we recognize the validity of constitutional considerations requiring some deviation from strict numerical equality, the issue then presented is how far from absolute equality must the redistricting proceed in order to effectuate these other legitimate considerations. The Commission has not seen fit to explain or justify its Final Plan in any way or to specify the grounds on which it dismissed the exceptions

**2.** While upholding the Commission's Final Plan in *Specter v. Levin,* 448 Pa. 1, 293 A.2d 15 (1972), the majority expressly recognized the validity of the constitutional proscription against splitting political subdivisions:

> In *Reynolds,* Section 16's additional objectives for reapportionment plans were specifically recognized as legitimate considerations which can justify some divergences from a strict population standard.

The Court held:

> A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims.

> \* \* \* \* \* \*

> Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions.

448 Pa. at 8, 13, 293 A.2d at 18, 21, *quoting, Reynolds v. Sims,* 377 U.S. 553, 580–581, 84 S.Ct. 1362, 1391–1392, 12 L.Ed.2d 506 (1964). *See also Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (approving of population variations among districts to advance rational state policy of respecting boundaries of political subdivisions); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

**3.** *Specter v. Levin,* 448 Pa. at 8, 293 A.2d at 18 (1972) (Emphasis supplied), *quoting, Reynolds v. Sims,* 377 U.S. at 578, 84 S.Ct. at 1390 (1964).

filed by appellants herein. We therefore have nothing before us from the Commission but the Final Plan itself. Nevertheless, the majority concludes that the Final Plan "reflects a constitutionally permissible judgment on the part of the Commission that the deviations from mathematical compactness and political subdivision boundaries contained in the plan are necessary to achieve the overriding constitutional goal of districts 'as equal in population as practicable.'" I respectfully submit that there is nothing in the barren record before us to support any such conclusion.[4] Unless the Commission is required to give some explanation of the *absolute necessity* for each challenged split of a political subdivision, no appeal could ever possibly succeed, and the Commission would be given a virtually unlimited license to read out of the Constitution the express and legitimate prohibition against dividing political subdivisions unless *absolutely necessary* to do so. The majority's willingness to approve the Final Plan more or less on blind faith thus effectively deprives appellants of their express constitutional right of appeal.

As Justice Pomeroy cogently stated in his dissenting opinion in *Specter v. Levin* :

Faced with the greatly increased number of splits in the Commission's new plan, the court today makes the blanket statement that "[t]his increase was obviously necessitated by the stricter requirements of population equality that are now in order." This may be a good guess, but to me it is by no means obvious. In the face of constitutional language which prohibits divisions unless "absolutely necessary," there surely must be some showing of necessity, some demonstration that "the population principle cannot be otherwise satisfied." The Commission has vouchsafed nothing, and the Court is reduced to trying to read its mind. It may be acknowledged that some dividing of counties, municipalities and wards and some surrender of

4. Neither the majority nor the Commission makes any attempt to address the particular exceptions filed by appellants.

compactness is unavoidable, but there is no presumption that each split that was made or each misshapen district that was created falls into this category. That the final plan has "the force of law" (Pennsylvania Constitution art. 2, § 17) does not "bootstrap" its every feature into a position of automatic constitutional validity, absent a showing of necessity.

448 Pa. at 27, 293 A.2d at 28 (Pomeroy, J., dissenting), *quoting, Butcher v. Bloom*, 415 Pa. 438, 465, 203 A.2d 556, 571 (1964).[5] The sparse record before us, however, contains no explanation for the Commission's frequent splits of political subdivisions or the lack of compactness in many of the districts created by the Final Plan.[6]

This Court should not sustain the Final Plan without some evidence supporting the conclusion that the Commission fully considered *all* of the constitutionally-mandated reapportionment standards and that it complied with each of them to the fullest extent possible consistent with the overriding objective of constructing districts as nearly equal in population as practicable.

LARSEN, J., joins in this dissenting opinion.

**5.** The phrase "absolutely necessary" in Section 16 can only be read with reference to the immediately preceding requirement that the districts "be composed of compact and contiguous territory as nearly equal in population as practicable." The words "absolutely necessary" give special emphasis to the principle of preserving the integrity of political subdivisions, *unless* the subdivisions *must* be divided to comply with constitutional requirements of substantial population equality and compactness.

**6.** The Commission's own figures indicate a pronounced increase in the number of "splits" of political subdivisions in the 1981 Final Plan which redraws districts in such a way as to cross many more boundaries of political subdivisions than did either the Plan drawn by this Court in 1966 or the Plan sustained by us in 1971.

| | 1966 | 1971 | 1981 |
|--------|------|------|------|
| SENATE | 13 | 36 | 40 |
| HOUSE | 30 | 169 | 230 |

*See* Respondent's Brief at 21, *Specter v. Levin*, 448 Pa. at 24 n. 3, 293 A.2d at 26 n. 3, (Pomeroy, J., dissenting).