67 A.3d 1211

Amanda E. HOLT, Elaine Tomlin, Luis Nudi, Diane Edbril, Dariel I. Jamieson, Lora Lavin, James Yoest, Jeffrey Meyer, Christopher H. Fromme, Timothy F. Burnett, Chris Hertzog, Glen Eckhart, Joan Jessen, Elizabeth Rogan, James Hertzler, Gary Eichelberger, Barbara B. Cross, and Mary Frances Ballard, Appellants

v.

2011 LEGISLATIVE REAPPORTIONMENT COMMISSION, Appellee.

Dennis J. Baylor, Appellant

v.

2011 Legislative Reapportionment Commission, Appellee.

State Representative John P. Sabatina, Jr. for the 174th Legislative District and State Representative Thomas R. Caltagirone for the 127th Legislative District, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Thomas Schiffer, Rachel J. Amdur, Joan Tarka, Lawrence W. Abel, Margaret G. Morscheck, Lawrence J. Shrzan, Shirley Resnick, Susan Jewett, and Carl Duzen, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Patty Kim, Appellant

v.

2011 Legislative Reapportionment Commission, Appellee.

Council President Holly Brown, Mayor Carolyn Comitta, John Hellman, Mayor Leo Scoda, Council President Rich Kirkner, Councilperson Jennifer Mayo, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Daniel P. Doherty, Cheryl L. Nicholas, Stacy C. Hannan, Kristine L. Kipphut, Susan Saba, Tara Anthony, Paula Brensinger, and Seth D. McElroy, Petitiones, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

State Representative Angel Cruz, State Representative W. Curtis Thomas, State Representative Rosita C. Youngblood, State Representative John P. Sabatina, Jr., Angel Ortiz, Brian Eddis, Joseph F. West, Sr., and Karen A. West, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Josh Shapiro, Leslie Richards, Daylin Leach, Samuel Adenbaum, Ira Tackel, Marcel Groen, Harvy Glickman, and David Dormont, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Senator Jay Costa, Senator Lawrence M. Farnese, Jr., Senator Christine M. Tartaglione, Senator Shirley M. Kitchen, Senator Leanna M. Washington, Senator Michael J. Stack, Senator Vincent J. Hughes, Senator Anthony H. Williams, Senator Judith L. Schwank, Senator John T. Yudichak, Senator Daylin Leach, Senator Lisa M. Boscola, Senator Andrew E. Dinniman, Senator John P. Blake, Senator Richard A. Kasunic, Senator John N. Wozniak, Senator Jim Ferlo, Senator Wayne D. Fontana, Senator James Brewster, and Senator Timothy J. Solobay, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Tony Amadio and Joe Spanik, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee

Richard Lattanzi, Mayor of the City of Clairton and Richard Ford, Councilman in the City of Clairton, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Kathryn Vargo, Jennifer Grab, Sandra Wolfe, Antonio Lodico, Emily Cleath, Daniel McArdle Booker, Rachel Canning, and Patrick Clark, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Supreme Court of Pennsylvania.

Submitted Sept. 10, 2012.

Argued Sept. 13, 2012.

Decided May 8, 2013.

376

Shauna Christine Clemmer, PA Department of State, for Bureau of Elections, Department of State, Participant.

Kathleen M. Granahan, Linda L. Kelly, Harrisburg, PA Office of Attorney General, for Attorney General's Office, Participant.

Dennis J. Baylor, Pro Se, for Petitioner.

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for John P. Sabatina, Jr., and Thomas R. Caltagirone, Petitioner.

Kelly R. Koscil, Eric Louis Ring, for T. Schiffer, R. Amdur, J. Tarka, L. Abel, M. Morscheck, L. Chrzan, S. Resnick, S. Jewett, and C. Duzen, Petitioner.

Peter M. Good, Thomas S. Lee, Caldwell & Kearns, P.C., Harrisburg, for Patty Kim, Petitioner.

Frank A. Rothermel, Bernhardt & Rothermel & Siegel, P.C., Philadelphia, for D. Doherty, C. Nicholas, S. Hannan, K. Kipphut, S. Saba, T. Anthony, P. Brensinger, and S. McElroy, Petetioner.

Margaret M. Stuski, for A. Cruz, W. Thomas, R. Youngblood, J. Sabatina, Jr., A. Ortiz, B. Eddis, J. West, Sr., K. West, Petitioner.

Adam Craig Bonin, Cozen O'Connor, for J. Shapiro, L. Richards, D. Leach, S. Adenbaum, I. Tackel, M. Groen, H. Glickman, D. Dormont, Petitioner.

Clifford B. Levine, Pittsburgh, for Senator Jay Costa, et al., Petitioner.

David J. Montgomery, Pittsburgh, for Tony Amadio and Joe Spanik, Petitioner.

J. Deron Gabriel, for Richard Lattanzi and Richard Ford, Petitioner.

Charles Anthony Pascal, Jr., for Kathryn Vargo, et al., Petitioner.

Patrick Kennedy Cavanaugh, Stephen John Del Sole, William Shaw Stickman IV, Pittsburgh, Del Sole Cavanaugh Stroyd, L.L.C., The Honorable Joseph A. Del Sole, for Respondent.

Mary Ann Mullaney, Brian S. Paszamant, Blank Rome LLP, Philadelphia, Brian Michael Robinson, DLA Piper US, LLP, Philadelphia, Carl Merritz Buchholz, Philadelphia, for Senator Dominic Pileggi, Respondent Amicus Curiae.

Kathleen A. Gallagher, Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, for Michael Turzai, as a Member of the 2011 PA Legislative Reapportionment Commission, Respondent Amicus Curiae.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.

This is the second set of direct appeals to this Court arising out of the work of the 2011 Legislative Reapportionment Commission ("LRC") of the Commonwealth of Pennsylvania.

Previously, we filed a *per curiam* order on January 25, 2012, and declared that the legislative redistricting plan filed by the LRC on December 12, 2011 (the "2011 Final Plan"), was contrary to law under Article II, Section 17(d) of the Pennsylvania Constitution, and in accordance with the directive in that constitutional provision, we remanded the matter to the LRC to reapportion the Commonwealth in a manner consistent with an opinion to follow. We filed our opinion on February 3, 2012. *Holt v. 2011 Legislative Reapportionment Comm'n,* 614 Pa. 364, 38 A.3d 711 (2012) (*"Holt I"*). No party sought reconsideration or reargument. As a result of this Court's order and opinion, the LRC produced a second plan which it adopted on June 8, 2012 (the "2012 Final Plan"), and these consolidated appeals arise out of challenges to that plan. After consideration of the specific challenges forwarded by appellants, and the LRC's response, we now hold that the LRC's 2012 Final Plan is not contrary to law, and the appeals are dismissed.

## I. *Background*

The substantive task of the LRC during decennial legislative redistricting is governed by Article II, Sections 16 and 17 of the Pennsylvania Constitution. Section 16 sets forth specific criteria the LRC must utilize in creating the legislative district map:

> The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.

PA. CONST. art. II, § 16. Section 17 further describes the redistricting procedure, and specifically provides that, once the LRC has adopted a plan, "any aggrieved person" may appeal directly to this Court. PA. CONST. art. II, § 17(d). Section 17 also commands that, if that aggrieved citizen "establishes that the final plan is contrary to law," this Court "shall issue an order remanding the plan to the commission and directing the commission to reapportion the Commonwealth in a manner not inconsistent with such order." *Id.*[1]

1. Section 17 describes in detail the procedures for constituting the LRC, and the LRC's responsibilities during the decennial reapportionment. In relevant part, Section 17 provides:

 **§ 17. Legislative Reapportionment Commission**
 (a) In each year following the year of the Federal decennial census, a Legislative Reapportionment Commission shall be constituted for the purpose of reapportioning the Commonwealth. The commission shall act by a majority of its entire membership.
 (b) The commission shall consist of five members: four of whom shall be the majority and minority leaders of both the Senate and the House of Representatives, or deputies appointed by each of them, and a chairman selected as hereinafter provided. No later than 60 days following the official reporting of the Federal decennial census as required by Federal law, the four members shall be certified by the President pro tempore of the Senate and the Speaker of the House of Representatives to the elections officer of the Commonwealth who under law shall have supervision over elections. The four members within 45 days after their certification shall select the fifth member,

By way of further background, in *Holt I,* we summarized the litigation over the 2011 Final Plan:

On December 12, 2011, the LRC approved its Final Plan by a vote of 4 to 1, with Senate Minority Leader Jay Costa dissenting.

Absent appeals within the thirty day period afforded by the Constitution, the Final Plan would have had force of

who shall serve as chairman of the commission, and shall immediately certify his name to such elections officer. The chairman shall be a citizen of the Commonwealth other than a local, State or Federal official holding an office to which compensation is attached. If the four members fail to select the fifth member within the time prescribed, a majority of the entire membership of the Supreme Court within 30 days thereafter shall appoint the chairman as aforesaid and certify his appointment to such elections officer. Any vacancy in the commission shall be filled within 15 days in the same manner in which such position was originally filled.

(c) No later than ninety days after either the commission has been duly certified or the population data for the Commonwealth as determined by the Federal decennial census are available, whichever is later in time, the commission shall file a preliminary reapportionment plan with such elections officer. The commission shall have thirty days after filing the preliminary plan to make corrections in the plan. Any person aggrieved by the preliminary plan shall have the same thirty-day period to file exceptions with the commission in which case the commission shall have thirty days after the date the exceptions were filed to prepare and file with such elections officer a revised reapportionment plan. If no exceptions are filed within thirty days, or if filed and acted upon, the commission's plan shall be final and have the force of law.

(d) Any aggrieved person may file an appeal from the final plan directly to the Supreme Court within thirty days after the filing thereof. If the appellant establishes that the final plan is contrary to law, the Supreme Court shall issue an order remanding the plan to the commission and directing the commission to reapportion the Commonwealth in a manner not inconsistent with such order.

(e) When the Supreme Court has finally decided an appeal or when the last day for filing an appeal has passed with no appeal taken, the reapportionment plan shall have the force of law and the districts therein provided shall be used thereafter in elections to the General Assembly until the next reapportionment as required under this section seventeen.

\* \* \*

(h) If a preliminary, revised or final reapportionment plan is not filed by the commission within the time prescribed by this section, unless the time be extended by the Supreme Court for cause shown, the Supreme Court shall immediately proceed on its own motion to reapportion the Commonwealth....

PA. CONST art. II, § 17 (footnotes omitted).

law. *See* PA. CONST. art. II, § 17(e). However, twelve separate appeals from the 2011 Final Plan were filed by citizens claiming to be aggrieved, as is their constitutional right. *See* PA. CONST. art. II, § 17(d) ("Any aggrieved person may file an appeal from the final plan directly to the Supreme Court within thirty days after the filing thereof."). In each appeal, the appellants filed petitions for review, against several of which the LRC filed preliminary objections. The LRC also filed a prompt consolidated answer, responding to the first eleven petitions for review. This Court then directed briefing on an accelerated schedule; all parties timely complied. The Court reserved a special session to hear oral argument on January 23, 2012, in Harrisburg, five days after briefing, and we heard argument in nine of the appeals that day. . . .

Two days later, on January 25, 2012, this Court issued a *per curiam* order, declaring that the Final Plan was contrary to law, and remanding to the LRC with a directive to reapportion the Commonwealth in a manner consistent with this Court's Opinion, which would follow. *See* Order, 1/25/12 (*per curiam*) (citing PA. CONST. art. II, § 17(d)). Our *per curiam* order also directed that the 2001 Legislative Reapportionment Plan, which this Court previously ordered to "be used in all forthcoming elections to the General Assembly until the next constitutionally mandated reapportionment shall be approved," would remain in effect until a revised final 2011 Legislative Reapportionment Plan having the force of law is approved. *See* Order, 1/25/12 (*per curiam*) (citing PA. CONST. art. II, § 17(e) and *Albert* [*v. 2001 Legislative Reapportionment Commission,* 567 Pa. 670], 790 A.2d [989,] 991 [Pa.2002]). That aspect of our mandate arose by operation of law; where a Final Plan is challenged on appeal, and this Court finds the plan contrary to law and remands, the proffered plan does not have force of law, and the prior plan obviously remains in effect. *Holt I,* 38 A.3d at 719–21 (footnotes omitted). Justices Baer, Todd and McCaffery joined the majority opinion by this author in *Holt I,* Justices Saylor and Eakin each filed a

concurring and dissenting opinion, and Justice Orie Melvin filed a dissenting opinion. *Id.* at 716–64.

After the *Holt I* decision was filed, Senator Dominic Pileggi and Representative Michael Turzai—both members of the LRC by virtue of their positions as majority leaders of their respective caucuses—filed suit in federal court seeking to enjoin this Court's directive that existing districts should be used in the 2012 election cycle and until the Court approved a constitutional reapportionment plan. In a February 8, 2011 order, the federal district court denied relief and concluded that the 2012 elections must proceed under the only existing map, the 2001 Plan. *Pileggi v. Aichele,* 843 F.Supp.2d 584 (E.D.Pa.2012).

Ultimately, after one public meeting, the LRC produced a new preliminary redistricting plan in April 2012. Timely exceptions, and alternative plans, were lodged, but the LRC ultimately adopted the preliminary plan as its 2012 Final Plan by a 4–1 vote on June 8, 2012, with LRC member, and Senate Minority Leader, Senator Jay Costa voting against the Plan. Appellants then filed petitions for review at thirteen separate docket numbers in this Court, all of which were consolidated for purposes of briefing, argument, and decision.

■ We consider the parties' arguments in light of our scope and standard of review, which was a central point of dispute in *Holt I,* leading the Court to discuss the appropriate review paradigm at some length. Our scope of review is plenary, subject to the restriction that "a successful challenge must encompass the Final Plan as a whole;" in addition, we will not consider claims that were not raised before the LRC. 38 A.3d at 733 (citing *Albert, supra* and *In re Reapportionment Plan,* 497 Pa. 525, 442 A.2d 661, 666 n. 7 (1981) (*"In re 1981 Plan"*)). Our standard of review is defined by the Pennsylvania Constitution: the plan may be held unconstitutional only if the appellants establish that it is "contrary to law." 38 A.3d at 733 (citing PA. CONST. art. II, § 17(d)). In *Holt I,* we determined that the LRC's 2011 Final Plan was contrary to law because it did not comply with the require-

ments, set forth in Article II, Section 16 of the Pennsylvania Constitution, that legislative districts be "composed of compact and contiguous territory as nearly equal in population as practicable," and that political subdivisions should not be divided to form districts "unless absolutely necessary." Pa. Const. art. II, § 16. This Court engages in a *de novo,* non-deferential review of the specific challenges raised by the appellants. 38 A.3d at 735–36. A final plan is not entitled to a presumption of constitutionality, but "enjoys the same status as any action or decision where the challenging party bears the burden; and here, the burden is upon appellants to show that the plan is contrary to law." *Id.* at 735.

## II. *Appellants and their Various Claims*

### A. *The Appellants*

As we stated in *Holt I,* our Constitution "permits any aggrieved person to file an appeal from the LRC's plan directly to this Court." *Id.* at 724–25 (citing Pa. Const. art. II, § 17(d)). As with appeals from the 2011 Final Plan, the instant appeals from the 2012 Final Plan were brought by various registered Pennsylvania voters, both Republican and Democrat. And, as with the 2011 Final Plan litigation, the lead appeal in the instant matter, captioned *Holt v. LRC* and docketed at 133 MM 2012, was filed by "voters in the Commonwealth of Pennsylvania who live in the Commonwealth's wards, municipalities, and counties the [2012 Final Plan] split, often multiple times, to form Senate and House of Representatives Districts [which the voters claim was] in violation of Article II, Section 16." Holt Brief at 8. The *Holt* appellants hail from Lehigh, Philadelphia, Allegheny, Delaware, Chester, Washington, Montgomery and Cumberland Counties.

Appellants in the appeal docketed at 39 WM 2012 (*"Costa "*) are LRC member, and Senate Minority Leader, Senator Jay Costa and the entire Democratic Senate Caucus. Appellants in 40 WM 2012 (*"Amadio "*), Tony Amadio and Joe Spanik, and appellants at 41 WM 2012 (*"Lattanzi "*), Richard Lattanzi and Richard Ford, who are the mayor and a councilman of the

City of Clairton, in Allegheny County, join in and incorporate the arguments in *Costa.* Appellant in 129 MM 2012 (*"Kim"*), is an elected official and voter in Dauphin County, who joins the *Costa* brief and also forwards additional arguments specific to Harrisburg, Pennsylvania. Appellants in 42 WM 2012 (*"Vargo"*) are voters from Westmoreland, Allegheny and Cumberland Counties. *Pro se* appellant Dennis J. Baylor, at 126 MM 2012 (*"Baylor"*), is a voter in Berks County. Appellants in 127 MM 2012 (*"Sabatina"*) are elected officials and voters from Philadelphia and Reading, Pennsylvania. The appellants in 128 MM 2012 (*"Schiffer"*) are voters from Delaware County. In the appeal docketed at 130 MM 2012 (*"Brown"*), appellants are residents and elected officials of West Chester and Phoenixville, in Chester County. At docket number 131 MM 2012 (*"Doherty"*), appellants are residents of Philadelphia, Montgomery, Bucks, Lehigh and Fayette Counties, and Audubon, Pennsylvania. Appellants in 132 MM 2012 (*"Cruz"*) are voters and elected officials in Philadelphia County. Finally, appellants in 134 MM 2012 (*"Shapiro"*) are voters and elected officials from Montgomery and Delaware Counties who join the *Costa* brief and add further argument in their own brief.

In all of these appeals, the LRC is appellee. The LRC does not dispute the standing of any of the appellants.[2]

## B. *Claims Raised by Appellants*

In their current appeal, the *Holt* appellants raise a global challenge to the LRC's 2012 Final Plan. They argue that the plan as a whole, like its predecessor, is contrary to law because it contains numerous political subdivision splits that are not absolutely necessary, in contravention of Article II, Section 16 of the Pennsylvania Constitution. According to

---

**2.** The LRC does argue, however, that the appeals in *Sabatina, Schiffer, Kim, Brown, Shapiro, Amadio,* and *Lattanzi* are mere localized challenges, rather than challenges to the 2012 Final Plan as a whole, and should therefore fail on this basis alone. Since we hold that the global challenges fail, and we will not revisit our precedent requiring that challenges be made to the plan as a whole, any appeal presenting a localized challenge necessarily fails.

appellants, the alternate *Holt* plan maintains "a roughly equivalent level of population deviation.... while employing significantly fewer political subdivision splits" as directed in *Holt I*, and proves that the LRC's 2012 plan still violates Section 16. Holt Brief at 15 (quoting from *Holt I*, 38 A.3d at 753). The *Holt* appellants claim that any differences between the 2011 Final Plan and the 2012 Final Plan are irrelevant for purposes of the constitutional analysis; any marginal reduction in splits from one plan to the next is attributable only to the relaxed population equality standard prospectively approved in *Holt I*. The *Holt* parties submitted a revised alternate plan that also allowed a greater range of deviation from the ideal population of each House and Senate district, as contemplated by this Court's *Holt I* opinion. Holt Brief at 7; 38 A.3d at 761. The *Holt* plan uses a maximum deviation from ideal population of 7.87% for Senate Districts and 7.75% for House Districts, as compared to the higher percentage deviations in the LRC's 2012 Final Plan (7.96% in Senate Districts and 7.88% in House Districts). Holt Brief at 15.

The *Holt* appellants further argue that the LRC could have easily achieved a substantially greater fidelity to all of the mandates of Section 16—compactness, contiguity, and integrity of political subdivisions—yet it failed to do so. According to the *Holt* appellants, the LRC could have reduced total splits (counties, municipalities, and wards) as follows:

| | *2012 Final Plan* | *Holt Alternate Plan* |
| --- | --- | --- |
| HOUSE | 221 | 86 |
| SENATE | 37 | 17 |

Holt Brief at 16; LRC Brief at 27–28. The *Holt* appellants allege that the extra splits in the LRC's plan "serve no legitimate purpose." Holt Brief at 20.

The *Holt* appellants also argue that the 2012 Final Plan violates Section 16's requirements of compactness, using the "Polsby and Popper method"[3] for quantitatively measuring

3. According to the *Holt* appellants, the Polsby and Popper method "has been widely recognized as a means of measuring compactness 'quantitatively in terms of dispersion, perimeter, and population ratios.' *Vieth v. Jubelirer*, 541 U.S. 267, 349 & n. 3 [124 S.Ct. 1769, 158 L.Ed.2d 546 (2004)] (Souter, J., dissenting) (citing Polsby & Popper, *The Third*

this aspect of the plan in terms of "dispersion, perimeter and population ratios." Holt Brief at 28. According to the *Holt* appellants, the average Polsby and Popper score for the Senate districts under the 2012 Final Plan is 0.275, as compared to .351 under the revised *Holt* alternate plan, and in the House, the average score for the 2012 Final Plan is 0.277, as compared to 0.372 under the *Holt* alternative. "The Revised Holt Plan therefore offers Senate districts that are more than 27% more compact than the LRC's map and House districts that are more than 34% more compact than the LRC's map. Moreover, the Revised *Holt* Plan achieved a greater degree of compactness in 40 out of 50 Senate Districts and 161 out of 203 House Districts." *Id.* at 28–29. The *Holt* appellants argue that their alternate plan demonstrates that the "compactness problems" of the 2012 Final Plan are not unavoidable. *Id.* at 30. Finally, the *Holt* appellants argue that the 2012 Final Plan has not resolved earlier problems with inadequately contiguous territory, and the new map still has seven unnecessary non-contiguous House districts.

The *Holt* appellants assert that in light of what they perceive to be the LRC's repeated and willful failure to comply with constitutional requirements, this Court should remand with instructions that the LRC adopt a plan that contains no more political subdivision splits than those contained in the *Holt* plan, and that complies with Section 16's mandate that the district map be comprised of "compact and contiguous territory as nearly equal in population as practicable."

The *Costa* appellants similarly challenge the 2012 Final Plan as a whole, and argue that the LRC's maps continue to violate constitutional mandates, while serving instead to preserve the partisan results of political gerrymandering.[4] The *Costa* ap-

Criterion: *Compactness as a Procedural Safeguard Against Partisan Gerrymandering*, 9 YALE L. & POLICY REV. 301, 339–351 (1991) (other citations omitted)).... The objective formula used to compute the ratio yields a score between 0 and 1.0, with 0 being the least compact possible district and 1.0 being the most compact district possible." Holt Brief at 28.

4. The *Lattanzi, Amadio* and *Kim* appellants adopt and join in the *Costa* brief, while also making localized challenges.

pellants begin by noting that, in Pennsylvania, the "Republican Party currently controls both the Senate and the House. In the Senate, 30 seats are held by Republicans and 20 seats are held by Democrats. Of the 203 House seats, 110 are held by Republicans and 91 are held by Democrats. The number of registered voters in the Commonwealth includes approximately 4 million registered Democrats and approximately 3 million registered Republicans." Costa Brief at 3 (footnotes omitted). The *Costa* appellants identify various alleged unnecessary splits and problems in contiguity and compactness exhibited by the 2012 Final Plan, and assert that the LRC failed to consider the *Holt I* opinion, public testimony, and alternate plans presented to it.[5] In addition, according to appellants, the LRC rejected Senator Costa's proposed amendment to the plan, which demonstrated how splits of ten counties—Beaver, Berks, Bucks, Butler, Cumberland, Chester, Franklin, Warren, Washington and Westmoreland—could easily be eliminated, thus reducing the total number of county splits by almost 20 percent while still maintaining population deviation ranges identical to those in the Republican Caucus Plan, which was the plan actually adopted as the LRC's 2012 Final Plan. Costa Brief at 23. The *Costa* appellants argue that these additional splits are not necessary, and were included in the LRC maps for no legitimate constitutional reason. According to the *Costa* appellants, the LRC acted in furtherance of inappropriate political objectives, in order to maintain incumbencies, preserve or improve partisan political performance and to ensure Republican party majority rule in both houses of the General Assembly, irrespective of the party affiliations and preferences of Pennsylvania voters.

Appellant Kim joins in the *Costa* brief for a global challenge, but adds argument specific to Dauphin, Perry and

5. The *Costa* appellants focus their brief on alleged unnecessary subdivision splits and provide very little substantive argument regarding contiguity and compactness. They do argue that the 2012 Final Plan fails to address the need for more compactness of the 35th Senatorial District, which is drawn to extend from Pennsylvania's southern border to the northern border of Clearfield County, a distance of 109 miles, and places Bedford County in the 35th District for the first time. Costa Brief at 26.

Cumberland Counties, which, under the LRC's new map, are split into three senatorial districts even though Cumberland County's entire population could be contained in one. Kim notes that, although the 2012 Final Plan restores the City of Harrisburg to its historical place in the 15th Senatorial District, a result for which she advocated in *Holt I,* the new plan "significantly reduces the importance of Dauphin County's community interests by also including Perry County," and "dilutes the voice of Harrisburg's voters." Kim Brief at 2. Kim challenges "the inclusion of rural Perry County with urban Harrisburg [which] appears to be in deliberate disregard of the Court's previously stated guidance and admonition." *Id.*

The *Vargo* appellants challenge the 2012 Final Plan as a whole, adopting the *Holt* appellants' legal analysis with respect to compactness and contiguity requirements. The *Vargo* appellants also argue specifically that the plan contains unnecessary splits for Senate districts in Cumberland, Butler, Huntingdon, Warren, and Washington Counties, and wards in the City of Pittsburgh, thus diluting the African–American vote there, and House districts in Montgomery, Allegheny, Dauphin, Delaware, and Bucks Counties. According to the *Vargo* appellants, these splits are not absolutely necessary, and "many are not even arguably or marginally necessary, to achieve any Constitutionally valid objective." Vargo Brief at 15. The *Vargo* appellants assert that the LRC has provided no explanation for the excessive political subdivision splits, despite the *Holt* alternate plan's easy eradication of those extra splits. The *Vargo* appellants claim that there is no reason to expect the LRC will correct these problems in any future remand, and thus this Court should fashion affirmative relief itself or through appointment of a master. *Id.* at 28.

Acting *pro se,* appellant Baylor challenges the plan as a whole and argues that the LRC unnecessarily divided counties, otherwise violated constitutional requirements, and has materially altered the form of the Commonwealth's government. Baylor asserts that, as a lifelong resident of Berks County, he has voted in elections for over forty years, but has

never had an opportunity to pick a Berks County resident for the General Assembly. Baylor has fashioned an alternate plan that he says does not include unnecessary splits, and which he claims demonstrates that the LRC's 2012 Final Plan does not meet constitutional requirements.[6]

Next, the *Sabatina* appellants, who are state representatives from Philadelphia and Reading, challenge the 2012 Final Plan as a whole, and also raise more localized challenges arising out of the configuration of their own House districts: the 170th, 172nd, 173rd and 174th in Philadelphia, and the 126th and 127th in Reading. They argue that their new districts contain numerous unnecessarily split wards, and are neither compact nor contiguous, in violation of Section 16 requirements. The *Sabatina* appellants contend that these splits result in absurd district shapes which serve only improper political considerations, and they have presented an alternate plan for their districts that avoids this problem.[7]

6. Baylor further contends that the LRC's latest plan was promulgated in violation of Pennsylvania's open meeting Sunshine Act. The Sunshine Act provides, generally, that "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered)." 65 Pa.C.S. § 704. In his reply brief, apparently in response to the LRC's claim that it did not hold any executive sessions in preparing the 2012 Final Plan, *see infra* at 32, Baylor withdraws his Sunshine Act claims and focuses instead on the LRC's alleged violation of the Constitution's more general "right of the people to a free government founded our [sic] authority." *Id.* at 7 (citing PA. CONST art. I, § 2). Baylor argues that any closed "deliberative sessions" held by the LRC are void *ab initio* on the basis of this constitutional right. We do not perceive a constitutional basis for disapproving the 2012 Final Plan in this shifting argument.

7. According to the *Sabatina* appellants, Representative Sabatina's 174th House district "is clearly an odd shape with an Appendix going up to the 66th Ward," and includes parts of four different wards; "getting to these divisions in [Sabatina's] proposed new district involves crossing a major four lane highway and circumventing an airport and an industrial park. The neighborhoods in Philadelphia are in shambles." Sabatina Brief at 22–23. With regard to Representative Caltagirone's 127th House district, which comprises part of the City of Reading, the *Sabatina* appellants argue that the 2012 Final Plan makes Reading a "true mess of twisted geography." Sabatina Brief at 25 & Appendix at A–57.

The *Schiffer* appellants object specifically to the House map insofar as it splits Haverford Township in Delaware County, arguing that this split is one of many unnecessary splits in the entire 2012 Final Plan. The *Schiffer* appellants submitted an alternate plan to the LRC, which describes all 203 House districts, reduces the number of township splits in both Delaware and Montgomery Counties, and spares Haverford Township from division. According to the *Schiffer* appellants, that alternate plan would reduce the LRC's political subdivision splits and shows the LRC's plan is contrary to law because Section 16 allows only splits that are absolutely necessary.

The *Brown* appellants complain that the 2012 Final Plan unnecessarily splits the 155th, 156th and 157th House districts in the municipalities of West Chester and Phoenixville, in Chester County, and that these splits were effected only for partisan political purposes, *i.e.*, to remove registered Democrats and the current Democratic candidate for the 156th District for future elections. According to the *Brown* appellants, these splits—and others in the 2012 Final Plan, such as those in Philadelphia County—also create legislative districts that violate Section 16 requirements of contiguity and compactness.[8] The *Brown* appellants argue that partisan political considerations should not defeat clear constitutional provisions.

The *Doherty* appellants reside in Philadelphia, Montgomery, Bucks, Lehigh and Fayette Counties, in political subdivisions that they claim were unnecessarily divided by the LRC's plan. They provide an alternate plan which they state reduces unnecessary municipal splits in House districts "by a whopping 90%" and, they claim, the ward splits can also be reduced by 87%. Doherty Brief at 9–10. The *Doherty* appellants also claim that their alternate plan reduces county splits in the Senate by 25% and ward splits by 85%, which they argue further demonstrates that the LRC's plan as a whole has

8. The *Brown* appellants' substantive arguments focus on alleged unnecessary subdivision splits rather than issues of compactness and contiguity.

political subdivision splits that are not absolutely necessary, and thus it is contrary to law.

The *Cruz* appellants, who reside in the City and County of Philadelphia, challenge the 2012 Final Plan as a whole. Their alternate plan is designed to show that the LRC's plan has an unconstitutional impact on Latino and other minority voter communities, and was adopted in violation of the Sunshine Act, the Voting Rights Act, and due process requirements. The *Cruz* appellants argue that the LRC sought "to frustrate local established political structures," and could have instead created a "constitutional plan with political areas respected as compact and contiguous, Latino and African American minority interests given a fair opportunity and due process and good faith afforded to all." Cruz Brief at 9.[9] Despite population numbers that should dictate a different result, the *Cruz* appellants argue, there is only one Latino state representative, and no elected Latino state senator, in the entire Commonwealth. The *Cruz* appellants claim that the LRC's plan reflects an underrepresentation of a recognized political class and thereby constitutes a Voting Rights Act violation.[10]

9. The *Cruz* appellants do not make additional substantive arguments about compactness and contiguity in their brief. They do allege that former Councilman Angel Ortiz "was not afforded ample opportunity to speak before the LRC." Cruz Brief at 13.

10. The Voting Rights Act provides, in pertinent part:

**§ 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been

The *Shapiro* appellants, who join in the arguments presented by the *Costa* appellants as to the LRC's plan as a whole, also provide localized challenges specific to Montgomery County and other Philadelphia suburbs, to show that the LRC placed express constitutional requirements beneath partisan political interests in adopting the 2012 Final Plan. The *Shapiro* appellants argue that the plan improperly and unnecessarily fragments Montgomery County into six Senate districts, none of which is wholly contained in that county. In their view, the sole purpose of this obvious gerrymandering is "to remove Democratic-leaning voters from potentially competitive suburban districts." The *Shapiro* appellants claim that the subdivision splits which created these artificial districts turn what would and should be "swing" districts into districts with a comfortable Republican edge. Shapiro Brief at 4, 8. Finally, the *Amadio* and *Lattanzi* appellants simply join the brief and arguments in *Costa*, without making any further argument on their own behalf.

## C. *The Response of the LRC*

The LRC responds to all appellants in one omnibus brief. The LRC states that it went "back to the drawing board" after *Holt I* and created a redistricting plan that complies with the constitutional requirements of Section 16. The LRC claims that it has:

> elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. 42 U.S.C. § 1973. We note that the *Cruz* appellants' arguments based on alleged Voting Rights Act violations are identical to claims that were made in federal court with regard to the 2001 district map, which remained in effect after *Holt I*, but the district court denied relief. *Pileggi v. Aichele*, 843 F.Supp.2d at 597 ("Under these unique circumstances, we are compelled to conclude that the election should proceed under the only-existing plan, the 2001 Plan. The granting of a temporary restraining order at this juncture would make no sense. Clearly, it would not be in the public interest."). The *Cruz* appellants have not provided further record support nor have they developed their Voting Rights Act argument in the instant appeal challenging the 2012 Final Plan. The claim therefore fails.

created districts that are significantly more compact than the 2011 Plan. It has drastically reduced the number of subdivision splits. The difference between the 2012 Final Plan and [appellants'] alternative plans (created without the need for compromise) is significantly reduced. The 2012 Final Plan respects communities of interest, particularly county seats—unifying all but one (unless mathematically impossible). It fully complies with the Voting Rights Act and, in doing so, gives full voice to the growing Latino population of this Commonwealth. It preserves the cores of existing districts fostering continuity of representation and not affecting the [current] partisan composition of the legislature.

LRC Brief at 1.

In seeking to explain the importance of compromise and political factors in the process of creating a new district map, the LRC quotes from the historical record of the 1967–68 Constitutional Convention, including a statement from one delegate during debate regarding proposed schemes for redistricting:

The perfect reapportionment plan is impossible to draft. For this reason, the various qualities which should be considered in drafting a reapportionment plan cannot be made absolute constitutional requirements. Various weights and priorities can be given to these qualities, however, as long as freedom to deviate from them is permitted when the various requirements of a good plan are in conflict. The fact that frequent deviation from any particular requirement may be required should not, however, cause the omission of the requirement if it is otherwise a sound requirement of good apportionment.... It became obvious, upon actually working on an apportionment plan, that the final result, even in the best plan, will fall far short of perfection.... It becomes necessary, therefore, at times, to sacrifice the best possible plan in one area in order to avoid the worst possible one in another some distance away.

LRC Brief at 6 (quoting Delegate Jerry Powell, *Daily Journals of the Pennsylvania Constitutional Convention of 1967–*

*1968,* Volume 1, No. 38 at 532 (February 7, 1968)). Citing to the same historical source, the LRC further notes the intention behind having partisan leaders from the General Assembly centrally involved in the reapportionment process: "The use of the partisan leaders of each [legislative] chamber was intended to serve both as an opportunity to harness the voices of all legislators of both parties through their leaders, and as a check and balance." *Id.*

As a result of this recognized need for legislative involvement, compromise and balance, argues the LRC, it must not be limited to consideration of the specific objective criteria listed in Section 16, but rather, the LRC must also be free to consider more subjective factors which it has the experience and discretion to apply. The LRC argues that its authority to consider these additional factors is constitutionally conferred, as it is inherent in the design of the commission described in Section 17. Specifically, the LRC insists that it is empowered to take into account existing or historical districts or communities of interest, to preserve the cores of existing legislative districts in order to ensure a continuity of representation which voters have chosen in the past (*i.e.,* to enhance incumbents' electability), as well as to address majority/minority districts within the bounds of the Voting Rights Act. The LRC argues that it must include these political considerations in its deliberations, just as it must consider compactness, contiguousness, and the number and location of subdivision splits, while it also seeks districts as nearly equal in population as possible.

The LRC claims that the population deviations of less than 10% in the 2012 Final Plan are well within the recalibrated latitude envisioned in *Holt I, see, e.g.,* 38 A.3d at 761, and the federal constitutional limits cited in *Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). In *Voinovich,* the U.S. Supreme Court quoted from *Brown v. Thomson,* 462 U.S. 835, 842–843, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), as follows: "[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a *prima facie* case of invidious discrimination under

the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a *prima facie* case of discrimination and therefore must be justified by the State." 507 U.S. at 161, 113 S.Ct. 1149 (internal quotation marks and citations omitted).

The LRC states that its 2012 Final Plan has achieved a total range of population deviation of 7.88% in the House and 7.96% in the Senate, and no legislative district deviates more than 3.98% from the "ideal" district size.[11] LRC Brief at 24. The LRC argues that the uneven distribution of population throughout the Commonwealth makes it "absolutely necessary" to divide some counties, municipalities and wards; it asserts that the Section 16 requirement that there be no political subdivision splits unless "absolutely necessary" cannot be "an inflexible, mathematical standard." Rather, "[i]t must be viewed under the realities of the reapportionment process," taking into account other goals of redistricting, such as preserving communities of interest and "continuity of representation," so that the decennial process causes "as little upheaval and uncertainty as possible." LRC Brief at 11–14. The LRC claims that it received comments from "scores of citizens" who were satisfied with their current representatives and urged the LRC to preserve the general boundaries of their districts. *Id.* at 15.

More pertinently, the LRC argues that none of the appellants have met the burden of establishing that the 2012 Final Plan, as a whole, is contrary to law. With regard to alternative plans presented by various appellants, the LRC complains

11. The "ideal" district size is determined by dividing the Commonwealth's population into 203 House and 50 Senate districts. PA. CONST. art. II § 16. According to the LRC, based on the 2010 census data, the "ideal House district has a population of 62,573. The largest district [in the 2012 Final Plan] has a population of 65,036, the smallest has 60,110. The ideal Senate district has a population of 254,048. The largest [in the 2012 Final Plan] has 264,160 and the smallest has 243,946." LRC Brief at 24 n. 6. No appellant disputes these figures.

that these plans were not subject to public review or comment—they were "completely unvetted"—and that the various appellants drew the plans without being subject to the various political considerations that the LRC believes must be taken into account when adopting a plan, such as respect for communities of interest, continuity of representation, and the Voting Rights Act. LRC Brief at 21. Repeating its failed argument from *Holt I*, the LRC insists that this Court should not even include alternate plans in its scope of review, though it concedes that the scope of review is properly defined by the Court, and *Holt I* made clear that alternate plans could be offered as evidence that an approved plan was contrary to law. Although the LRC acknowledges that this Court's prior cases approving earlier reapportionment plans do not serve as a "constitutional preclearance," the LRC argues that such prior approved plans should be considered additional "evidence" of a current plan's compliance with the law. LRC Brief at 22. In any event, the LRC contends that the 2012 Final Plan should be affirmed under the scope and standard of review articulated and explained in *Holt I*. According to the LRC, even when viewed in the light of competing alternate plans, its 2012 Final Plan fulfills the mandates of *Holt I* and complies with all constitutional, legal and prudential reapportionment factors, and also significantly reduces the number of subdivision splits from the number contained in the unconstitutional 2011 Final Plan.

Moreover, the LRC argues, the Section 16 language regarding political subdivision splits that are not "absolutely necessary" has never been taken as an inflexible, mathematical standard, and *Holt I* did not set "firm parameters" for its limits. LRC Brief at 25 (quoting 38 A.3d at 757). Nevertheless, the LRC argues that, due to population distribution in Pennsylvania, it is indeed mathematically necessary to split 15 counties and two municipalities (Philadelphia and Pittsburgh) in establishing Senate districts. Moreover, the LRC explains, the 2012 map for the Senate divides only ten counties which have less than the population of an ideal district, and these splits are justified by other factors. The LRC emphasizes

that its map for the House likewise does not split any municipalities unless mathematically necessary, and claims that it divides only nine counties and 51 municipalities not mathematically required by the dictates of population. LRC Brief at 27–32. Moreover, the LRC insists that the districts created by the 2012 Final Plan are compact and contiguous in a way that the unconstitutional 2011 plan was not, and particularly, Senate Districts 3, 15 and 35, which were specifically called into question in *Holt I,* have been redrawn. *See Holt I,* 38 A.3d at 757. The LRC concedes that there remain strange district shapes under the 2012 map but explains that these have been made necessary in many places by geographical features such as mountains, rivers, valleys and forests, and in some instances, by a few largely uninhabited areas.

According to the LRC, only one county seat, Pottsville, Schuylkill County, which could mathematically have been united, remains divided in the 2012 Final Plan, and this division for purposes of the House is only because both the Mayor and the City Council of Pottsville specifically requested that it remain divided between the 123rd and 125th House districts. The LRC further argues that it has "labored under the proposition that, as much as population permits, the choice of the people in their elected officials should not be vitiated. As such, where possible, the [LRC] used cores of existing districts as the starting point of its reapportionment efforts.... to respect the choice of voters, and to foster the efficiency that stems from continuity of representation." LRC Brief at 40.[12]

12. Representative Michael Turzai and Senator Dominic Pileggi, who both are members of the LRC by virtue of their positions as majority leaders of their respective chambers in the Pennsylvania General Assembly, have filed separate *amicus curiae* briefs in support of the LRC. There is some redundancy in these filings by members of the LRC, since the LRC as a body has zealously defended the plan in a separate 96–page brief filed by the LRC's counsel. The commissioners are also parties, and parties do not typically file *amicus* briefs. *See* Pa.R.A.P. 531 (anyone interested in questions involved in appeal, "although not a party," may file brief *amicus curiae* ). Commissioner Turzai explains that he filed his own brief based on his "position as a member of the Commission, with his resultant interest in defending the 2012 Final Plan, and his specialized knowledge in this area." Turzai Brief at 7. Commissioner Pileggi states his interest as *amicus* arises out of his

The LRC also argues that the Pennsylvania Constitution does not define contiguity or compactness as related to legislative districts, but that this Court has defined a contiguous district as "one in which a person can go from any point within the district to any other point (within the district) without leaving the district, or one in which no part of the district is wholly physically separate from any other part." LRC Brief at 10 (quoting *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15, 23 (1972)). The LRC notes that, in the 2012 Final Plan, "the few districts with non-contiguous irregularities have a combined population of 68," and that such districts "have been part of nearly every Pennsylvania reapportionment." *Id.* at 37. With regard to compactness, the LRC states it is a difficult concept to quantify where the Commonwealth's population is spread unevenly across a large and diverse geography, such that balancing the factors of population equality and integrity of political subdivisions necessitates "a certain degree of unavoidable non-compactness in any reapportionment scheme." *Id.* at 10 (quoting *Specter*, 293 A.2d at 23). The LRC cautions generally that its redistricting map should not fail simply because "the shape of a particular district is not aesthetically pleasing." *Id.*

With respect to the *Holt* appeal specifically, the LRC argues as follows. First, the LRC criticizes the *Holt* appellants' method of counting political subdivision splits, because the

position as a citizen, registered voter, State Senator, Majority Leader for the State Senate, and as a member of the LRC. Pileggi Brief at 1. The *amicus* briefs, in any event, largely echo points ably forwarded by the LRC. The Turzai brief goes further and misapprehends certain aspects of *Holt I*, *see* Brief at 8 (claiming that, in *Holt I*, "this Court for the first time held that the 2011 Final Plan was too focused on the federal standard"), and seeks to relitigate other issues resolved in *Holt I*, such as the scope of review and the level of judicial deference in reviewing any final plan. To the extent the brief would raise issues not implicated in the presentations of the parties, we of course will not reach those issues. *See Commonwealth v. Cotto*, 562 Pa. 32, 753 A.2d 217, 224 n. 6 (2000) ("An *amicus curiae* is not a party and cannot raise issues that have not been preserved by the parties."); Pa.R.A.P. 531(a) (interested party may file an *amicus curiae* brief concerning those questions before appellate court). *Accord Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 928 n. 14 (2006) (issue raised only by *amicus* and not by parties not before Court).

*Holt* appellants include what they term "fractures," thus over-counting the number of counties, municipalities and wards that are divided. In any event, the LRC argues that the mere fact that the appellants created a plan with fewer raw splits—a point the LRC does not dispute—does not signify that the 2012 Final Plan is contrary to law because appellants did not have to concern themselves with important political consider-ations, public comment or the need to reach a majority consensus. Moreover, the LRC maintains, the difference between the number of splits in the current *Holt* plan and the LRC's 2012 Final Plan is much less substantial than the discrepancy at issue in *Holt I*'s review of the 2011 Final Plan, which the Court struck down. According to the LRC, the difference between the LRC's 2012 Final Plan and the *Holt* plan is "negligible" and "insignificant." LRC Brief at 44. And, the LRC argues, when viewed in light of the total number of counties, municipalities and wards in Pennsylvania, the number of splits in the 2012 Final Plan is "miniscule." *Id.* at 47. The LRC argues that alternate plans will always have fewer splits than plans devised by the LRC, and that fact "is a direct and inescapable function of the constitutional composi-tion" of the LRC, and the process of compromise that Section 17 is designed to foster. *Id.* at 49–51.

The LRC further notes that a comparison of the 2012 Final Plan with earlier plans shows it is one of the strongest ever produced, with comparatively fewer subdivision splits in both Senate and House districts, and these older plans should be viewed as evidence to the same extent the *Holt* plan—or any other alternate plan—is so viewed. Furthermore, according to the LRC, adoption of the *Holt* plan would throw the Commonwealth into electoral chaos, and would create unnec-essarily radical reapportionment. The *Holt* plan, according to the LRC, draws 42 House incumbents into legislative districts with another incumbent, meaning it would result in the loss of at least 21 current elected representatives as a result of redistricting alone, rather than as a result of choices made by voters. LRC Brief at 59–60. Finally, the LRC argues that

the *Holt* alternate plan raises various Voting Rights Acts concerns.

With regard to the *Holt* appellants' arguments regarding contiguousness, the LRC focuses on "geographical anomalies" that it says makes any non-contiguous districts found in the 2012 Final Plan unavoidable. The LRC states that it "chose to avoid creating new splits and dividing citizens and communities of interest for the sole purpose of unifying a handful of nearly uninhabited geographic quirks." LRC Brief at 55–56. And, with regard to the *Holt* appellants' challenge to the compactness of districts in the 2012 Final Plan, the LRC states that the Polsby and Popper method espoused by the *Holt* appellants is just "one of several privately produced mathematical formulae intended to measure compactness in some rigid, mechanical manner," and that this method is not binding on the LRC or this Court. In fact, the LRC argues, another method of measuring compactness—*e.g.*, the "Reock Test"—shows that the *Holt* alternate plan and the 2012 Final Plan are essentially indistinguishable, and that given the geographic anomalies of the Commonwealth, the 2012 Final Plan is sufficiently compact. *Id.* at 57–58.

Likewise, the LRC argues that the *Costa* alternate plan does not prove that the 2012 Final Plan is contrary to law, but merely that the LRC's plan does not serve the competing political interests of the *Costa* appellants. Moreover, in the LRC's opinion, the *Costa* plan makes only minor reductions in the number of county splits, and only on the Senate side. Furthermore, the LRC notes, the 2012 Final Plan resolves issues relating to Harrisburg by replacing it in the 15th Senatorial District, and reducing the number of Senate Districts in Dauphin County to two, the mathematical minimum it may have.[13] According to the LRC, the *Costa* appellants, and appellant Kim, continue to object to this placement because of

---

**13.** The configuration of Senate District 15 in the 2011 Final Plan—described as an "iron cross" shape—was one of the specific compactness problems noted in *Holt I*. *See* 38 A.3d at 757 (Senate District 15 "facially problematic" in terms of compactness). The LRC does not respond separately to the *Costa* appellants' claims regarding compactness of the 35th Senatorial District.

the way the 15th District is now configured, but these specific concerns do not demonstrate that the 2012 Final Plan is contrary to law. The LRC adds that the 2012 Final Plan also preserves the 45th Senate District in Allegheny County, a goal sought by Senator Costa, which demonstrates that the LRC's map has a bipartisan aspect.

Next, the LRC rejects the alternative plan presented by the *Doherty* appellants, claiming that it is rife with mathematical errors, lacks legal descriptions, and also, because those appellants did not present the alternate plan to the LRC prior to this appeal, and thus, they have waived any right to present it now.[14] In any event, the LRC argues that the *Doherty* alternate plan does not establish that the 2012 Final Plan is contrary to law. Similarly, the LRC argues that the *Vargo* appellants have based their appeal on an alternate plan nearly identical to that of the *Holt* appellants, and as the *Holt* plan does not prove that the 2012 Final Plan is contrary to law, the *Vargo* plan does not provide such proof either.

The LRC next addresses the procedural and substantive claims of *pro se* appellant Baylor. The LRC argues first that Baylor's claim of Sunshine Act violations is meritless; the LRC asserts it never conducted material deliberations at closed "executive sessions," and in fact, "went to great length to avoid even the appearance of impropriety by ensuring that there was never a time when a quorum of Commissioners.... were even in the same room together other than a properly noticed meeting." LRC Brief at 79.[15] On Baylor's substantive claims, the LRC states that Baylor has not preserved his right to present an alternate plan, has not provided proper legal descriptions, and has not shown that the 2012 Final Plan is contrary to law.[16]

14. The LRC's argument on this point is somewhat undermined by its statement later in its brief that "the Commission does not believe that there is a *per se* requirement that an alternative plan is a necessary prerequisite to filing an appeal." LRC Brief at 81.

15. As we have noted in our earlier description of Baylor's argument, he withdrew and recast his Sunshine Act claim. *See supra* note 6.

16. In reply, Baylor defends his submissions by explaining the limits in producing more complete maps engendered by the high cost of pur-

The LRC also rejects the *Sabatina* appeal, claiming it focuses on localized challenges to ward splits in the appellants' Reading and Philadelphia districts, rather than on the 2012 Final Plan as a whole, and therefore should be dismissed. In any event, argues the LRC, the *Sabatina* appeal does not establish that the 2012 Final Plan is contrary to law.[17] Similarly, the LRC argues that the *Schiffer* appeal is aimed only at the 2012 Final Plan's division of Haverford Township, Delaware County, House districts, and thus is not a proper challenge to the plan as a whole. In any event, the alternate plan presented by the *Schiffer* appellants reduces the number of splits in the LRC's plan only minimally, and does not demonstrate a constitutional violation. The *Brown* appellants also make localized challenges to a division of municipalities, according to the LRC, and any arguments against the plan as a whole are *pro forma* only. The LRC insists that "issues of substantially equal population, geography and demography **require** the division of municipalities." LRC Brief at 87 (emphasis in original). The LRC further argues that in determining which municipalities to divide, it must make discretionary value judgments. *Id.* (citing *In re 1981 Plan*, 442 A.2d at 668 (drawing district lines necessarily involves value judgments)). In addition, the LRC asserts that the *Schiffer* appellants' claim of a diluted minority vote is factually without merit.

The LRC rejects the *Cruz* appellants' challenge as well, reiterating its position that it never held an executive session, and that all aspects of the reapportionment process were open and transparent. The LRC insists that appellant Angel Ortiz was permitted to testify within the time limits established for its public hearings, and the 2012 Final Plan recognizes and respects the growth of the Latino population in Pennsylvania; however, the LRC states that there are still not enough Latinos in any single compact area to constitute the majority

chasing computer programs and reprinting large format maps. Baylor argues his summary maps are sufficient substitutes for the voluminous data involved here. Baylor Reply Brief at 6 (citing Pa. R.E. 1006).

17. The LRC does not separately respond to the *Sabatina* appellants' additional arguments regarding compactness and contiguity.

of a Senate district. The LRC also argues that the *Shapiro* appellants focus on Montgomery County, rather than the redistricting map as a whole, and their claims are therefore not sufficient to prove that the 2012 Final Plan is contrary to law. In any event, the LRC states, when viewed as a whole, the divisions in Montgomery County are reasonable considering the dense population of the region and the county's vastly varied constituent municipalities. With regard to the *Amadio* appeal, the LRC points out that the appellants focus on the split of Beaver County, rather than challenging the 2012 Final Plan as a whole. In any event, states the LRC, a greater portion of Beaver County is unified in the 2012 Final Plan than in the earlier map, and the Senate plan splits the county only one time over its mathematical minimum. The LRC similarly rejects the *Lattanzi* appeal, narrowly focused as it is on the movement of the City of Clairton, in Allegheny County.

## III. Discussion

### A. General Considerations Regarding Review Standards and the Role of "Political" Factors

 As we have stated, our task in resolving the instant challenges is to determine whether the LRC's 2012 Final Plan is a map of compact and contiguous territory that "satisfies the constitutional requirement that the districts, in both houses of the state legislature, are as nearly of equal population as is practicable and that no political subdivision shall be divided in forming such districts unless absolutely necessary. In conducting this review, we must examine the final plan as a whole." [18] *Albert,* 790 A.2d at 995; PA. CONST. art. II § 16. We keep in mind that " 'to prevail in their challenge to the final reapportionment plan, appellants have the burden of

18. Although a few appellants have limited their challenges to their own districts and neighboring areas, we have focused our review on the global challenges presented by Holt, Costa and others. In addition, the LRC argues that the *Doherty* appellants and appellant Baylor have waived their claims on appeal because they did not submit alternate plans to the LRC in advance of the appeals. For decisional purposes, we will assume the global challenges made in the latter two appeals are not waived because, in any event, we determine that the better-developed global challenges fail.

establishing not . . . that there exists an alternative plan which is 'preferable' or 'better,' but rather that the final plan filed by the [LRC] fails to meet constitutional requirements.' " *Albert,* 790 A.2d at 995 (quoting *In re 1981 Plan,* 442 A.2d at 665).

■ The LRC's 2012 Final Plan is not entitled to any presumption of constitutionality. *Holt I,* 38 A.3d at 734. As the *Holt I* Court stressed last year, "[t]here is no basis for indulging a presumption of constitutionality in these circumstances. The most that can be said is that the Final Plan enjoys the same status as any action or decision where the challenging party bears the burden; and here, the burden is upon appellants to show that the plan is contrary to law." *Id.* at 735.

Preliminarily, we note that the LRC asks this Court to reconsider a central premise of *Holt I, i.e.,* our holding that the scope of review in redistricting appeals properly includes alternate plans submitted by the challengers, including plans created by private citizens. LRC Brief at 20–22. Notably, as the *Holt* appellants have stressed, the LRC did not file an application for reconsideration of this or any other issue in *Holt I,* and so, it is questionable whether this argument is available. *See* Pa.R.A.P. 2542(a)(1) (application for reconsideration must be filed within 14 days after entry of judgment or other order). On the other hand, we recognize that the litigation here, involving a new Final Plan, arguably is sufficiently distinct that the LRC's position resembles a request to revisit binding precedent forwarded in a circumstance of unrelated cases. In any event, on the merits of the claim, and aside from obvious concerns of *stare decisis,* the LRC has offered no persuasive reason to reconsider, much less to overrule, *Holt I.*

As the LRC concedes, the scope of review was specifically disputed in *Holt I* and the Court went to great lengths to explain the grounds for its determination, including a meticulous examination of our prior redistricting precedent, and the LRC's misapprehension of that precedent. 38 A.3d at 727–38. With respect to our specific holding that challengers to a final

plan may proffer alternate plans in an attempt to discharge their burden of proof, five Justices were in agreement, *see id.* at 762 (Saylor, J., concurring and dissenting), and no Justice expressed any disagreement. *See id.* at 762–63 (Eakin, J., concurring and dissenting) (partially joining); *id.* at 763–64 (Orie Melvin, J., dissenting). In explaining this holding, we noted, *inter alia*, that "legal challenges in general, and appellate challenges in particular, commonly involve an offering of alternatives. It is not effective advocacy to simply declare that a trial judge's ruling was erroneous; the good advocate addresses what the judge should have done instead." 38 A.3d at 730–31. We also credited, at least in part, the *Holt I* appellants' argument that the LRC's position was tantamount to saying that a Final Plan was unreviewable:

> We are also not persuaded by the LRC's claim that its existence and task requires that we deem alternative plans to be irrelevant and beyond our scope of review. The Constitution confers upon aggrieved citizens a **right** of appeal, measured by substantive standards specified in the charter. Such appeals must be meaningful, not illusory. The importance and difficulty of the LRC's task—a common burden in government—does not insulate its undertaking from the normal avenues of legal challenge, including arguments premised upon alternatives.

*Id.* at 733.[19]

The LRC's current criticisms of such alternate plans—*i.e.*, that they are not "vetted," that they are not produced under

---

**19.** The LRC also argues that our articulation of the scope of review was based in part on a "factually inaccurate representation" made by Holt respecting what was before the Court in *In re 1981 Plan* (the point being whether that court considered a global alternate plan). In forwarding the argument, the LRC goes outside the reported decision and discussion in *In re 1981 Plan*, looking to the pleadings. The LRC then notes that the challenger in 118 MM 1981 produced a statewide alternate plan. Holt responds by correctly noting, among other points, that reliance on the petitions and briefs filed in *In re 1981 Plan* "is misplaced, because those materials cannot supersede the description of the challenges provided by the Court" in its actual decision. And, indeed, our rejection of the LRC's position in *Holt I* was premised upon the content of the 1981 decision, since the LRC had claimed that the reported case affirmatively established a crabbed scope of review.

the pressure of having to generate a consensus, *etc.*—are matters that go to the comparative value or weight that should be accorded those plans in determining whether the appellants have met their burden, and not to their relevance. Furthermore, the LRC's own presentation on this appeal corroborates the relevance. The LRC has engaged aspects of the various alternate plans, and in the process has made legitimate points in criticism. The points in distinction make for a better assessment of the legality of the Final Plan, which remains the primary focus of the appeals. And, to reiterate what we explained in *Holt I*, it simply cannot be that the right to challenge specifically conferred by the Constitution is illusory. Accordingly, we reaffirm our explication of the scope of review in *Holt I*.[20]

We also reject, as we did in *Holt I*, the LRC's argument that its Final Plan should be automatically afforded special

The LRC's claim of factual misrepresentation is also persuasively rebutted by Holt:

> The Court correctly recognized that *Holt I* was its first opportunity to consider an alternative redistricting plan as evidence that the LRC's plan created unnecessary subdivision splits. Petitioners in *Holt I* presented that issue by basing their exceptions on an alternative plan which, for the first time, **accepted** the LRC's maximum population deviation and nonetheless achieved dramatic reductions in the number of subdivision splits. By contrast, *In re 1981 Plan* considered, and rejected, a different theory: that the LRC should have reduced the number of subdivision splits by adopting a **higher** deviation from population equality. 442 A.2d at 666. The Court in *In re 1981 Plan* had no opportunity to consider, and was not presented with, an alternative plan which provided an evidentiary basis for challenging the overall number of subdivisions splits by themselves.

Holt Reply Brief in Opposition at 2–3 (emphases original).

**20.** It is also worth noting that the challengers have scrupulously adhered to this Court's teachings respecting the relevance of alternate plans. Thus, the alternate plans proffered do not purport to attack the LRC's plan by, for example, producing an alternate plan involving a greater range of deviation in population equality, coming closer to the ten percent parameter that all seem to agree would be permissible under federal law. Obviously, a greater deviation in population would make it easier to avoid political subdivision splits. Instead, the *Holt* appellants, for example, employed slightly smaller ranges of deviation than those employed by the LRC and, starting from that benchmark, claim that the number of subdivision splits in the 2012 Final Plan are not absolutely necessary.

deference over challengers' plans, based on the "constitutional commission system," or the "practical difficulty" of assessing alternatives created by private citizens. LRC Brief at 21. As we made clear in *Holt I*, the Constitution simply "does not dictate any form of deference to the LRC, does not establish any special presumption that the LRC's work product is constitutional, and it also places no qualifiers on this Court's scope of review." 38 A.3d at 730. *See also id.* at 733–34, 753 n. 31. Of course, this is not to deny that the primary focus is upon the Final Plan, and not upon alternate plans. Thus, although the Court in *Holt I* concluded that Holt's alternate plan there "overwhelmingly" showed that the 2011 Final Plan was infirm, the Court also made clear that the LRC, upon remand, was not obliged to adopt, or even to start with, that alternate plan in going about its task to devise a constitutional map. *Id.* at 756–57. In addition, our articulation of the review paradigm in *Holt I*, as well as our holding that the 2011 Final Plan was contrary to law, did not deny the difficulty of the LRC's task or the considerable discretionary authority reposed in the LRC. *See* 38 A.3d at 735 n. 22 ("Our holding that the Final Plan is not entitled to a presumption of constitutionality does nothing to diminish the LRC's overall discretionary authority to redistrict the Commonwealth. As we make clear *infra*, our decision in this case does not command the LRC to devise particular benchmarks in terms of the number of subdivision splits, the extent of deviation in population equality, or the parameters of compact and contiguous districts. This paradigm recognizes the difficulty in the LRC's task and still reposes considerable discretion in its judgment.").[21]

21. The separate expressions by Justices Saylor and Eakin also emphasized the difficulty of the LRC's task, the practical constraints upon judicial review, as well as the greater deference on review that those Justices would have afforded. *See Holt I*, 38 A.3d at 762 (Saylor, J., concurring and dissenting) ("The allocation of the burdens and the affordance of deference in the judicial review reflect the complex nature of a commission's task and the constraints inherent in its oversight."); *id.* at 762–63 (Eakin, J., concurring and dissenting) (noting "[t]he process of redistricting is complex beyond words" and advocating for "significant deference" to LRC). The majority expression in *Holt I*, however, is now the governing law.

In the alternative, the LRC has accepted the governing review standard here, and has presented more developed arguments responding to the specific challenges, and alternate plans, that have been forwarded in this matter. This litigation posture stands in contrast to *Holt I,* where the LRC had "premised its central defense against these global challenges upon its position on the judicial review points," did not as directly engage the alternate plans, and did not offer pointed rebuttals to the powerful showing that Holt's alternate plan made about the constitutionality of the 2011 Final Plan. *Holt I,* 38 A.3d at 752. The resulting elucidation by the LRC, including its explication of certain legitimate additional considerations under which it labors, has proved helpful to our decisional task in this appeal.[22]

Before turning to the LRC's more targeted responses, we will address one remaining significant point implicating our review. As we have noted, the LRC argues that the requirements expressly set forth in Section 16 are not the only factors it may properly take into account when redistricting the Commonwealth. Specifically, the LRC argues that Section

---

**22.** Again, we recognize that there was division on the Court in *Holt I* concerning the absence of more targeted responses from the LRC to the alternate plans offered in those appeals, plans offered to prove the constitutional infirmity of the 2011 Final Plan. The Court's view included the recognition that the LRC "has had a full opportunity to offer neutral explanations of what were proven to be vast numbers of unnecessary splits of political subdivision, and failed to do so." 38 A.3d at 754 n. 34. In contrast, Justice Saylor voiced a more general concern that the "limited perspective concerning the difficulties encountered by the Commission in crafting a redistricting plan" made it difficult to so fault the LRC's presentation, *id.* at 762 (Saylor, J., concurring and dissenting), and Justice Eakin expressed the view that, "[a]n inherent problem in reviewing challenges to the ultimate plan is that no mechanism exists for the LRC to justify or explain its considerations or decisions." *Id.* at 763 (Eakin, J., concurring and dissenting).

Our present commentary on the contrasting litigation posture adopted by the LRC in these appeals is not intended as a criticism of the LRC or its distinguished counsel. The positions taken on the prior appeals, while narrower than here, were focused and well articulated, even though the characterizations proved to be unsupported by our precedent. The point in distinction offered in text merely recognizes the helpfulness of the fuller and more pointed response, including a more specific engagement with the challenges proffered, that have been articulated, in the alternative, by the LRC in these appeals.

16's substantive proscriptions concerning population equality, compactness, contiguity and integrity of political subdivisions are affected by a "secondary set of reapportionment factors" that derive from Section 17, the provision that establishes the composition of the LRC and procedures to govern its task. PA. CONST. art. II, §§ 16, 17. The LRC maintains that Section 16's substantive constraints must be viewed *in pari materia* with Section 17. Appropriating the "absolutely necessary" language from Section 16, the LRC then describes the interplay as follows:

> When reviewing a reapportionment plan's Section 16 factors *in pari materia* with the provisions of Section 17, it must be recognized that balance and compromise are necessary components of any reapportionment plan. It is absolutely necessary that the Commonwealth be reapportioned on a decennial basis.... [It] is absolutely necessary that a Commission comprised mainly of political floor leaders of both chambers be the body to effectuate that reapportionment. It is absolutely necessary that the Commission accomplish its work in a set time-frame. It is absolutely necessary that at least three Commissioners vote for a reapportionment plan and that the plan withstand public comment and the right of appeal. These absolute necessities under Article II, § 17 cannot be discounted when reviewing a plan's constitutionality—particularly in light of a challenge from an alternative plan created without the requirements of Article II, § 17.

LRC Brief at 12–13. In fact, the LRC's importation of "absolutes" into Section 17 is overstated. Indeed, Section 17(h) specifically contemplates a circumstance where the LRC fails in its task: "If a preliminary, revised or final reapportionment plan is not filed by the commission within the time prescribed by this section, unless the time be extended by the Supreme Court for cause shown, the Supreme Court shall immediately proceed on its own motion to reapportion the Commonwealth." In short, Section 17, unlike Section 16, does not speak in absolute terms, much less in absolutes that dilute the substantive constraints in Section 16. Of course, the LRC

should deem it imperative to make a good faith effort to timely accomplish its task of adopting a constitutional reapportionment plan.

The LRC goes further in its description of Section 17's supposed absolute effect, claiming that the largely-legislative composition of the LRC dictates "other factors which are inherent in the Commission's role in crafting a reapportionment plan," factors that the LRC believes "comprise legitimate, and necessary considerations for the Commission in undertaking its constitutional role." The LRC identifies what it describes as this "second layer" of "inherent" constitutional considerations as comprising: (a) a respect for communities of interest, (b) a respect for continuity of representation, and (c) a respect for the constraints of the federal Voting Rights Act. It cannot be disputed that the LRC has to pay heed to the third factor; but, this is a fact of federal law and the Supremacy Clause, U.S. CONST. art. VI, cl. 2, not a command inherent in Section 17's description of the composition of the LRC. The LRC's description of the other two factors warrants further examination.

The LRC says that *Holt I* "highlighted the concept of 'communities of interest'" when, in our discussion of the challenges in that case which focused only on "particular" political subdivision splits, we stated that "we trust that the LRC, in formulating its new plan, and necessarily reducing the political subdivision splits and fractures, will be attentive to the concerns of historically unified subdivisions, such as County seats." LRC Brief at 13 (citing *Holt I*, 38 A.3d at 758). Obviously, the equivalence suggested by the LRC is not exact: a unified political subdivision, such as a county seat, which *Holt I* spoke of, is a narrower concept than a "community of interest," and it is also an interest specifically protected by Section 16. This is not to say that we discount the consideration of perceived communities of interest; we will take up that point more directly in our discussion *infra*.

With respect to the "continuity of representation" interest that it says is constitutionally commanded, the LRC states that "[t]here is a legitimate interest in, wherever practical in

light of the other reapportionment factors, maintaining the continuity of representation by keeping in place the cores of existing legislative districts." The LRC then states that the U.S. Supreme Court has observed that " 'preserving the cores of prior districts and avoiding contests between incumbents' [sic] are legitimate redistricting considerations." LRC Brief at 14 (quoting *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983)). We note that *Karcher* was a case involving federal congressional redistricting in New Jersey, and the Court was not speaking of "inherent" constitutional considerations under Pennsylvania state law, or under any state constitution for that matter. Rather, the plan at issue in *Karcher* was adopted by the state legislature (just as federal redistricting in Pennsylvania is conducted legislatively, and not by commission), and the Court made clear it was speaking only of state legislative policies, not constitutional considerations: "Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." 462 U.S. at 740, 103 S.Ct. 2653. *Karcher* is not authority for the notion that this interest is of Pennsylvania constitutional dimension, on a par with the command to respect political subdivisions.

Furthermore, the notion that the Constitution independently, and tacitly, commands special respect for prior districting plans or incumbencies can be a mischievous one. The Constitution directs that the LRC will be comprised of the four partisan leaders of the General Assembly, with an agreed-upon, or Court-designated, fifth member as chair. Redistricting certainly requires choices and line-drawing, decisions which may affect the existing membership, and certainly will affect the future composition of the General Assembly. At least from the perspective of the legislative members of the LRC, the task is inherently political: the legislative members represent the interests of their caucuses and the shared interests of the General Assembly as a whole. Naturally, political parties seek to protect their own incumbent seats, and

it is perhaps no less natural that one or another party might go further and seek to press a perceived partisan advantage. *See Holt I,* 38 A.3d at 745 ("redistricting has an inevitably legislative, and therefore an inevitably political, element; but the constitutional commands and restrictions on the process [in Section 16] exist precisely as a brake on the most overt of potential excesses and abuse."). In an instance where there is a lack of bipartisan cooperation among legislative members, the presence of the fifth member should ensure that an agreement can be reached, and should serve as a brake upon the most excessive of purely partisan strivings. *See Specter,* 293 A.2d at 17 ("[E]qual representation on the Commission provided to the majority and minority members of each house precludes the reapportionment process from being unfairly dominated by the party in power at the moment of apportionment. In addition, the provision for a chairman who can act as a 'tiebreaker' eliminates the possibility of a legislative deadlock[.]").[23]

■ As we understand the constitutional commands, there is nothing at all to prevent a particular reapportionment commission from considering political factors, including the preservation of existing legislative districts, protection of incumbents, avoiding situations where incumbent legislators would be forced to compete for the same new seat, *etc.,* in drawing new maps to reflect population changes. However, we are unpersuaded by the argument that these political concerns are constitutionalized, that they must be accommodated, or, more to the dispute *sub judice,* that their consideration can justify what would otherwise be a demonstrated violation of the specific constitutional constraints enumerated in Section 16. These "political" factors can operate at will—so long as they do not do violence to the constitutional restraints

---

**23.** The power of the neutral fifth member to effectuate compromises and overall balance, even in years of partisan non-cooperation, cannot be overstated. There is nothing in the reapportionment paradigm requiring that the only plans to be considered should be competing ones emerging from various caucuses. The chair could insist that the starting point be a plan upon which there is some bipartisan consensus; and, if the legislative members refused or declined, the chair could suggest his/her own starting point.

regarding population equality, contiguity, compactness, and respect for the integrity of political subdivisions. In short, the requirements in Section 16 necessarily trump mere political factors that might color or corrupt the constitutional reapportionment process. *Holt I,* 38 A.3d at 745. *See also Wilson v. Kasich,* 134 Ohio St.3d 221, 981 N.E.2d 814, 820 (2012) (citing *Holt I,* 38 A.3d at 745) (Ohio Constitution does not prevent apportionment board from considering partisan factors in its apportionment decision, although partisan factors cannot override politically neutral constitutional requirements); *In re Reapportionment of the Colorado Gen. Assembly,* —— P.3d ——, 2011 WL 5830123, *3 (Colo.2011) ("Other nonconstitutional considerations, such as the competitiveness of a district, are not *per se* illegal or improper; however, such factors may be considered only after all constitutional criteria have been met"); *In re Legislative Districting of the State,* 370 Md. 312, 805 A.2d 292, 326 (2002) ("The constitution 'trumps' political considerations. Politics or nonconstitutional considerations never 'trump' constitutional requirements.").

■ The LRC paints its goals of preserving the cores of existing legislative districts, maintaining the existing partisan makeup of the General Assembly, and protecting incumbents as appropriate attempts to ensure that the citizens—and not reapportionment commissioners—choose their legislators. In the LRC's view, upheaval or uncertainty in the electoral process must be avoided, and "historical" legislative districts should be preserved out of respect for the choices of the voting public and in the interest of efficiency. However, we are not so naïve as not to recognize that the redistricting process may also entail an attempt to arrange districts in such a way that some election outcomes are essentially predetermined for voters—"safe seats" and the like. Again, we do not doubt the legitimacy of employing such political factors in the redistricting process—or, put more precisely, nothing in the Constitution prohibits their consideration. The constitutional reapportionment scheme does not impose a requirement of balancing the representation of the political parties; it does not protect the "integrity" of any party's political expectations.

Rather, the construct speaks of the "integrity" of political subdivisions, which bespeaks history and geography, not party affiliation or expectations. Presumably, innumerable maps could be drawn, motivated exclusively by the perceived political advantages they offer to one party or another, which do not do violence to the constitutional restrictions imposed by Section 16; the Constitution does not ban such political efforts.

But, this does not mean that a desire to protect incumbency, or to preserve prior district lines, or to maintain the political balance from a decade before, can go further and excuse a plan that achieves those political ends by doing unlawful violence to the restraints specified in Section 16. The political winds, and voter preferences, may shift over time. Citizens within a political subdivision may want a realistic chance to elect someone other than their incumbent. Assume a redistricting map in place which one party views as unfairly balanced (politically) to solidify or ensure the power of another party. In the next redistricting process, the party that considers itself aggrieved by the old map can seek to rework the map to accomplish what it views as a restoration of political balance—or even to tilt the balance more heavily in its favor. There is nothing in the Constitution to prevent such a politically-motivated effort—so long as it does not do unlawful violence to the core restraints expressed in Section 16. In short, there is no "preference for incumbency" or preservation of party representation restraint in our Constitution prohibiting future reapportionment commissioners from seeking to achieve this end; and if that view secures a majority vote of that year's LRC, and it does not do violence to the Section 16 restrictions, presumably, it can become law.

This is not an academic exercise. The *Costa* appellants, comprising the entire Democratic Senate Caucus, claim that the Senate district map in this Final Plan is not bipartisan at all, but essentially represents the preferences of the Republican Senate Caucus. The *Costa* appellants further allege that the 2001 Senate map already resulted in Republican dominance out of proportion to party registration and party voting

patterns in the Commonwealth. The *Costa* appellants then claim that the 2012 Senate map produced by the Republican Caucus, and ultimately adopted in the 2012 Final Plan, was designed to achieve partisan political objectives, *i.e.*, to maintain Republican incumbencies and to preserve or improve Republican performance out of proportion to what the *Costa* appellants believe are the actual preferences of the Pennsylvania electorate.

We need not credit these arguments. We offer them merely to demonstrate the flaw in the LRC's argument concerning the supposed constitutionalization of prior redistricting plans, and to demonstrate the limited **constitutional** relevance of protecting incumbents, protecting existing district lines, and preserving the existing partisan makeup of the General Assembly. The *Costa* appellants' complaints concerning perceived partisan motivations have no relevance to redistricting except insofar as they may relate to the specified and recognized constitutional bases for challenge; political parties may seek partisan advantage to their proverbial heart's content, so long as they do so within the constraints of Section 16. But, by the same token, in a future redistricting effort, the perceived imperative of incumbency protection or protection of existing district lines can be argued and perhaps honored as a discretionary matter, but it would not constitutionally constrain a future commission from making an adjustment. What would constrain the effort would be a meritorious challenge premised upon population equality, compactness, contiguity, respect for political subdivisions, or the Voting Rights Act.[24]

---

**24.** Justice Stephen Breyer, in a dissenting opinion in *Vieth v. Jubelirer*, 541 U.S. at 360, 124 S.Ct. 1769, a case involving an equal protection challenge, frankly described the value of political considerations in drawing electoral maps, while also expressing their limits and his own concern with potential abuses. We need not approve the expression to recognize its usefulness in terms of identifying the practical interplay of considerations:

This is to say that traditional or historically based boundaries are not, and should not be, "politics free." Rather, those boundaries represent a series of compromises of principle—among the virtues of, for example, close representation of voter views, ease of identifying "government" and "opposition" parties, and stability in government.

B. *Global Challenges Based Upon Splits of Political Sub-*

They also represent an uneasy truce, sanctioned by tradition, among different parties seeking political advantage.

As I have said, reference back to these underlying considerations helps to explain why the legislature's use of political boundary-drawing considerations ordinarily does not violate the Constitution's Equal Protection Clause. The reason lies not simply in the difficulty of identifying abuse or finding an appropriate judicial remedy. The reason is more fundamental: Ordinarily, there simply is no abuse. The use of purely political boundary-drawing factors, even where harmful to the members of one party, will often nonetheless find justification in other desirable democratic ends, such as maintaining relatively stable legislatures in which a minority party retains significant representation.

II

At the same time, these considerations can help identify at least one circumstance where use of purely political boundary-drawing factors can amount to a serious, and remediable, abuse, namely, the *unjustified* use of political factors to entrench a minority in power. By entrenchment I mean a situation in which a party that enjoys only minority support among the populace has nonetheless contrived to take, and hold, legislative power. By *unjustified* entrenchment I mean that the minority's hold on power is purely the result of partisan manipulation and not other factors. These "other" factors that could lead to "justified" (albeit temporary) minority entrenchment include sheer happenstance, the existence of more than two major parties, the unique constitutional requirements of certain representational bodies such as the Senate, or reliance on traditional (geographic, communities of interest, etc.) districting criteria.

The democratic harm of unjustified entrenchment is obvious. As this Court has written in respect to popularly based electoral districts:

"Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will." *Reynolds* [*v. Sims* ], 377 U.S. [533], at 565, 84 S.Ct. 1362 [12 L.Ed.2d 506 (1964)].

Where unjustified entrenchment takes place, voters find it far more difficult to remove those responsible for a government they do not want; and these democratic values are dishonored.

541 U.S. at 360–61, 124 S.Ct. 1769 (Breyer, J., dissenting) (emphasis in original). *See also id.* at 363–64, 124 S.Ct. 1769 ("The party that controls the process has no incentive to change it. And the political advantages of a gerrymander may become ever greater in the future. The availability of enhanced computer technology allows the parties to redraw boundaries in ways that target individual neighborhoods and homes, carving out safe but slim victory margins in the maximum number of districts, with little risk of cutting their margins too thin.").

*divisions*

■ Notwithstanding comparatively brief excursions into claims that the 2012 Final Plan contains districts that are insufficiently contiguous and compact, the appellants have devoted most of their energy to their arguments concerning alleged unnecessary political subdivision splits, and the LRC has responded with a similar focus. The subdivision splits indeed appear to present the more troublesome challenge. Although we view the question to be close, we ultimately conclude that the appellants have not proven that the 2012 Final Plan is contrary to law on grounds that it contains political subdivision splits that are not absolutely necessary. The Court in *Holt I* was careful to stress that it did not "set any immovable 'guideposts' for a redistricting commission to meet that would guarantee a finding of constitutionality, as against challenges premised upon population equality, subdivision splits, compactness, or contiguity." *Holt I*, 38 A.3d at 736. By the same token, *Holt I* was careful not to impose undue limits, or "firm parameters," upon the LRC in exercising its discretionary authority to devise a plan. The LRC stresses that its 2012 Final Plan is an improvement over the unconstitutional 2011 Final Plan, and indeed, is better than any previous redistricting plan in terms of compactness, contiguity, and respect for political subdivisions.

We doubt neither of these assertions; on the other hand, we recognize that improvement was inevitable once the *Holt I* Court announced, in the prospective guidance it afforded, that the LRC upon remand need not devise a reapportionment plan that "pursue[s] the narrowest possible deviation [in population among districts], at the expense of other, legitimate state objectives, such as are reflected in our charter of government." 38 A.3d at 760. We suggested that this prospective recalibration in the acceptable range of deviation from the ideal population for each district "should allow more breathing space for concerns of contiguity, compactness, and the integrity of political subdivisions." *Id.* at 759. The 2012 Final Plan contains population deviations that are significantly greater than the deviation ranges employed in the 2011 Final Plan:

under the 2012 Final Plan, the range of population deviation for the House is 7.88% (compared to 5.98% in the 2011 Final Plan), and for the Senate it is 7.96% (compared to 3.89% in the 2011 Final Plan). Indeed, the effect is so obvious, the *Holt* appellants suggest that the increase in population deviation alone accounts for the "improvement" in the LRC's 2012 Final Plan.

What is more important than the fact that the new plan is "better," or that the appellants claim that alternate plans they have devised prove that the LRC's better plan still contains subdivision splits that were not "absolutely necessary," is that *Holt I* made clear that "we do not direct a specific range for the deviation from population equality ... [n]or do we direct the LRC to develop a reapportionment plan that tests the outer limits of acceptable deviations." *Id.* at 761. We issued those caveats because we recognized that "the law in this area remains complex and dynamic," we respected the "considerable discretion" retained by the LRC in fashioning a constitutional plan, and we had no doubt the LRC was up to the task, and would engage in a good faith effort to devise a constitutional map. *Id.* The significance of these observations is twofold. First, even in pursuit of protecting the integrity of political subdivisions, the question is not one of mere mathematics or computer schematics: multiple constitutional and practical (geography, demographic distribution) values must be balanced in this exercise in line-drawing. And, second, it is not even possible to set a specific standard of deviation in population equality by which to measure, in any realistic sense, whether a subdivision split is necessary in some "absolute" sense. The parties agree that federal law safely permits a population deviation range of up to 10%. Adjusting population deviations by another quarter percentage point, say, presumably would allow room for fewer subdivision splits. But, Section 16 of Article II of the Pennsylvania Constitution does not speak of a 10% deviation range; it requires districts "as nearly equal in population as practicable." There obviously is discretion vested in the LRC to determine what is most practicable. *Holt I*, 38 A.3d at 738 (recognizing difficulty in

LRC's task, "not only because of the political and local interests that are affected by any change in the existing scheme, but also because accommodating one [constitutional] command can make accomplishing another command more difficult.").

According to the Pennsylvania Constitution, the Commonwealth must be divided into 50 Senate and 203 House districts. Based on 2010 census data, the ideal House district has a population of 62,573; the largest House district in the 2012 Final Plan has a population of 65,036, and the smallest has a population of 60,110. The ideal Senate district has a population of 254,048; the largest Senate district in the 2012 Final Plan has a population of 264,160, and the smallest has a population of 243,946. As noted, no legislative district, Senate or House, deviates more than 3.98% from the "ideal" district size, with a total deviation of 7.88% in the House and 7.96% in the Senate. Not surprisingly, there is no population equality challenge forwarded in these appeals.

The appellants argue that, while employing the same basic ranges of population deviation as the LRC, they have produced maps with fewer political subdivision splits. And, to take the Senate map for instance, measured by raw numbers, the *Holt* and *Costa* alternatives indeed contain fewer subdivision splits, including splits of counties, the largest of political subdivisions. (For example, the *Costa* plan presented the LRC with ten fewer county splits—20% of the total number of splits—than the Republican Caucus map, which was ultimately adopted as the 2012 Final Plan.) This is but a starting point for analysis of the legality of the plan, however, since there are a number of other factors to measure.

Another factor in favor of appellants, and frankly the one giving most reason for pause beyond the production of alternate plans with fewer subdivision splits, arises from the LRC premising so much of its argument upon the notion that preservation of the cores of prior districts, and protecting incumbents and the current political makeup of the General Assembly, are concerns requiring constitutional accommodation in the formulation of a new map. As we have noted, such political concerns may indeed be pursued and considered, so

long as their accommodation does not cause a demonstrated violation of Section 16 factors, factors which are politically neutral. The difficulty, however, resides in attempting to identify with any level of precision where and how, if at all, these political factors cross the line, and can be said to have caused subdivision splits that were not absolutely necessary. There is no relevant record of the reasons why particular splits were made, pointing in either direction. We are not unsympathetic to the plight of citizen challengers who have no way of going behind the plans that were produced, or assessing generalized responsive justifications. And, there is nothing inherent in the redistricting process to preclude the LRC from being more transparent in its intentions. But, on the other hand, the commission process is the process the Constitution has provided, the Constitution does not require that level of explication, it necessarily vests discretion in the judgment of the commissioner members, and it does so with a deliberate scheme where four of the five commissioners are the party leaders so as to, *inter alia*, " 'essentially retain[ ]' " " 'the Legislature's expertise in reapportionment matters.' " *Holt I*, 38 A.3d at 745 (quoting *Specter*, 293 A.2d at 17–18).

There are several factors that persuade us to conclude that the 2012 Final Plan is not contrary to law, as against the challenge that it contains subdivision splits that are not absolutely necessary. For one thing, unlike in *Holt I*, this is not a case where the challengers' presentation "overwhelmingly" shows the existence of political subdivision splits that rather obviously were not made absolutely necessary by competing constitutional, demographic, and geographic factors, and indeed where it was "inconceivable" that the number of subdivision splits was "unavoidable." *See Holt I*, 38 A.3d at 756. The pure mathematics are not nearly as dramatic with the 2012 Final Plan. The proffered alternate plans this time around thus more directly implicate the Court's repeated caution that the question is not whether there exists an alternative redistricting map which is claimed to be "preferable" or "better" than the LRC's map, but rather whether the LRC's proffered plan, which must balance multiple consider-

ations, fails to meet core and enumerated constitutional requirements. *Albert,* 790 A.2d at 995 (citing *In re 1981 Plan,* 442 A.2d at 665).

Viewed in raw terms (and not merely in comparison with other plans), the 2012 Final Plan has few raw splits when viewed in comparison to the total number of counties, municipalities and wards in the Commonwealth. In the Senate, the 2012 Final plan splits only 25 out of 67 counties, only two out of 2563 municipalities, and only ten out of 4462 wards. In the House, the 2012 Final Plan splits 50 out of 67 counties (many of those splits being inevitable based on population alone), 68 out of 2563 municipalities, and 103 out of 4462 wards. We agree with the LRC that the number of splits, over and above those numbers which would be inevitable even in the absence of other constitutional factors, is remarkably small.

The LRC's new plan is not perfect, nor is it directly responsive to every challenger's argument respecting individual subdivision splits. But, as we emphasized in *Albert* and reaffirmed in *Holt I,* our focus necessarily must be on the plan as a whole rather than on individual splits and districts, *Albert,* 790 A.2d at 996–98, given that "a certain amount of subdivision fragmentation is inevitable since most political subdivisions will not have the 'ideal' population for a House or Senate district." *Id.* at 993 (citing *Specter,* 293 A.2d at 23). *See also Holt I,* 38 A.3d at 758 ("In the end, however, we recognize that the Pennsylvania Constitution permits absolutely necessary political subdivision splits, and that some divisions are inevitable."). By necessity, a reapportionment plan is not required to solve every possible problem or objection in order to pass constitutional muster. Moreover, respecting the point that it may be possible to produce maps with fewer subdivision splits, that circumstance alone proves little, since respect for the integrity of political subdivisions is but one of multiple state constitutional and federal commands that must be accommodated.

Another consideration of some significance is that, even in the face of the objections and alternate plans that were proffered, the 2012 Final Plan, which lacks the stark, facially

problematic features of the 2011 Final Plan, was devised and accepted by a majority of the LRC in the wake of the directives we issued in *Holt I.* As the LRC has pointed out, any plan requires some compromise to achieve a majority vote; and any plan involves choices where some person or community or group may be aggrieved; along these lines, the LRC further argues, many of the alternate plans proffered here are notable in that they obviously further the interests of the individuals and groups that produced them. Thus, for example, the *Costa* alternate plan for the Senate, representing the Senate Democratic Caucus, had more subdivision splits than the *Holt* alternate plan.

Finally, in measuring the apparent strengths of the 2012 Final Plan against the probative value of alternate plans with fewer subdivision splits, we do not discount that redistricting efforts may properly seek to preserve communities of interest which may not dovetail precisely with the static lines of political subdivisions. Dean Gormley, whose hands-on experience and writings in this area proved helpful to the Court in *Holt I,* made the following point concerning communities of interest in a law review article that we cited with approval in *Holt I:*

> At the same time, states have historically considered a broad range of such imprecise communities of interest (many of which are naturally intertwined) in exercising their sound discretion. They do so to satisfy constituents. They do so to sweep together a host of generally identifiable interest groups that wish to be given a unified voice. This is perfectly healthy and permissible. It is an important aspect of the state's prerogative, when it comes to structuring its own form of government. Consequently, when it comes to reapportionment bodies considering race in this permissive, discretionary fashion, the courts should scrupulously avoid meddling.

*Holt I,* 38 A.3d at 746 (quoting Gormley, *Racial Mind–Games and Reapportionment,* 4 U. PA. J. CONST. L. 735, 780–81 (2002)). *Accord Holt I,* 38 A.3d at 745 (noting that constitutional restrictions in Section 16 "recognize that communities in-

deed have shared interests for which they can more effectively advocate when they can act as a united body and when they have representatives who are responsive to those interests."). We believe that this caution, though articulated in the context of concerns with equal protection and race, is no less appropriate when considering other, specifically identified constitutional redistricting concerns.

Balancing all of these interests, we believe that the 2012 Final Plan is not contrary to law on grounds that it does not respect the integrity of political subdivisions.

## C. *Challenges Implicating Compactness and Contiguity* [25]

■ The remaining challenges to the 2012 Final Plan— based on alleged violations of Section 16's mandate that districts be "of compact and contiguous territory"—fail for much the same reasons as do the challenges premised upon alleged unnecessary splits of political subdivisions. We first note that only the *Holt* appellants challenge the 2012 Final Plan as a whole on these additional grounds; other challengers focused on specific districts, *e.g.*, the *Costa* appellants claim the 35th Senatorial District should have been more compact, and the *Sabatina* appellants object to the shapes of the 127th and 174th House Districts. The *Holt* appellants rely on the Polsby and Popper method for measuring objective compactness of districts (*see* page 14 & n. 3, *supra*), but we agree with the LRC that it is not obliged to adopt this or any other of an apparent variety of such compactness models. Indeed, no principle has been articulated to us by which we may assess which of multiple methods of assessing compactness could or should be employed. In any case, even accepting the method favored by the *Holt* appellants, their alternate plan provides Senate districts that are approximately 27% more compact than the 2012 Final Plan, and House districts that are approximately 34% more compact than the 2012 Final Plan. Although this demonstrates that greater compactness is possible, it does

**25.** As we concluded in footnote 11, *supra*, the *Cruz* appellants' claim based on alleged violations of the Voting Rights Act is without merit, and warrants no further discussion.

not show that these compactness problems rise to the level of a constitutional violation, given the interplay of other constitutional imperatives. We have no reason to doubt the validity of the LRC's argument that the Commonwealth's population is spread out across a large and geographically diverse territory, and that balancing the factors of population equality and integrity of political subdivisions necessitates "a certain degree of unavoidable non-compactness in any reapportionment scheme." *Specter*, 293 A.2d at 23. We further agree with the LRC that the 2012 Final Plan should not fail simply because "the shape of a particular district is not aesthetically pleasing." *Id.* at 24. Given the geographic anomalies of the Commonwealth, taken together with the other factors that may properly be considered by the LRC, the appellants have not proven that the 2012 Final Plan is infirm on compactness grounds.

With regard to Section 16's requirement that legislative districts be comprised of "contiguous territory," we have stated that a contiguous district is "one in which a person can go from any point within the district to any other point (within the district) without leaving the district, or one in which no part of the district is wholly physically separate from any other part." *Specter*, 293 A.2d at 23. The LRC again defends the 2012 Final Plan based on geographic anomalies that make certain non-contiguous districts in the 2012 Final Plan unavoidable; the LRC notes that the same seven non-contiguous districts exist in both the 2011 and 2012 Final Plans. We did not strike the 2011 Final Plan on the basis that its districts were insufficiently contiguous. The LRC points out that, in these situations, it was faced with choosing between creating additional political subdivision splits and unifying areas divided by a "handful of nearly uninhabited geographic quirks." LRC Brief at 55–56. Furthermore, our independent review of the LRC's Senate and House maps discloses no overt instances of bizarrely shaped districts, bespeaking (as appellants allege) only an intent to gather together certain targeted blocs of voters. In this context, we do not believe the appellants

have proven that the 2012 Final Plan is contrary to law because legislative districts are insufficiently contiguous.

## IV. Conclusion

The matter has been ably briefed, both by concerned citizens and the LRC. For the reasons we have articulated above, we reaffirm *Holt I* as against the various challenges made to the decision; and we further determine that, as against the specific challenges presented in these various appeals, the LRC, in crafting the 2012 Final Plan, sufficiently heeded this Court's admonition that it "could have easily achieved a substantially greater fidelity to all of the mandates in Article II, Section 16" than it did in its unconstitutional 2011 Final Plan. *See Holt I*, 38 A.3d at 718. Moreover, we hold that the appellants have not demonstrated that the 2012 Final Plan is contrary to law. We therefore conclude that the LRC has utilized the population data of the 2010 census to create a redistricting map that complies with the Pennsylvania Constitution, which shall hereby have the force of law, beginning with the 2014 election cycle. The appeals are dismissed.

Jurisdiction relinquished.

Former Justice ORIE MELVIN did not participate in the consideration or decision of these appeals.

Justice EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion.

### CONCURRING OPINION

Justice SAYLOR.

My assessment of the 2011 Legislative Reapportionment Plan, and my conclusion that it satisfied constitutional requirements, are a matter of record. *See Holt v. 2011 Legislative Reapportionment Comm'n*, 614 Pa. 364, 447–48, 38 A.3d 711, 762 (2012) (*"Holt I"*) (Saylor, J., concurring and dissenting). Although expressing receptivity to the Court's movement to a "more circumspect position regarding the role of population

equality," *id.*, I was of the view that prospective guidance would have been appropriate. Ultimately, I noted that, in view of the substantial deference to be accorded to the LRC's 2011 plan, it satisfied constitutional requirements.[1] Likewise, I agree with the majority that the 2012 plan should be given the force of law and write further to comment on the nature of judicial review employed in connection with this *sui generis* governmental task.

Initially, however, I wish to note that, as before, my view of the actions of the 2011 Legislative Reapportionment Commission (the "LRC") differs somewhat from that of the majority. As I suggested in *Holt I*, particularly in view of the many difficulties (including, perhaps, necessary compromises) inherent in crafting a reapportionment plan, I believe that criticism of the internal process by which the LRC performs its constitutional obligations should be undertaken with caution. Contrary to the majority's assertions, moreover, the LRC's present advocacy does not appear to overstate the constitutional commands under which it operates. Rather, it seems to me, for example, that the LRC appropriately points out that Article II, Section 17 requires that the Commission be composed mainly of legislative floor leaders, accomplish its work in a set timeframe, and act by majority vote; and reasonably explains why continuity of representation, while not constitutionally required, represents a "legitimate consideration" that the LRC may, in its discretion, take into account. *See* Brief for LRC, at 12–15, 40.

Redistricting is, by design, a legislative undertaking. *See Holt I*, 614 Pa. at 420, 38 A.3d at 745 (acknowledging that redistricting has an "inevitably legislative" component); *see also Butcher v. Bloom*, 415 Pa. 438, 461, 203 A.2d 556, 569 (1964) ("The composition of the Legislature, the knowledge which its members from every part of the state bring to its deliberations, its techniques for gathering information, and other factors inherent in the legislative process, make it the most appropriate body for the drawing of lines . . . ."). As

---

1. The majority in *Holt I* held that the LRC's work is not entitled to deference or a presumption of constitutionality. *See Holt I*, 614 Pa. at 401–04, 38 A.3d at 734–35. This topic is discussed below.

such, it often involves amorphous and immeasurable "background factors"—which have been aptly described as a "second layer of inherent constitutional considerations." Majority Opinion, at 410, 67 A.3d at 1233 (summarizing the LRC's description). In reviewing the LRC's work product, this Court is often limited to an examination of the surface of a districting map whose features are supported by factors that are hidden from our view. Moreover, the very nature of the maps, with their 50 Senate and 203 House districts covering thousands of political subdivisions in a state with a distinctive topography and highly uneven population distribution, may leave us with little apart from intuition to gauge whether the district shapes and political subdivision splits exceed the "outer limits of justifiable deference," *Albert v. 2001 Legislative Reapportionment Comm'n*, 567 Pa. 670, 688, 790 A.2d 989, 1000 (2002) (Saylor, J., concurring)—particularly as there is no requirement that the LRC provide an explanation for its decisions.

A logical consequence is that the Commission's final work product is, by necessity, reviewed largely for an abuse of discretion. I recognize that it is now binding precedent that a final plan approved by the LRC does not carry a presumption of constitutionality, and as such, it is not reviewed deferentially. *See Holt I*, 614 Pa. at 401–02, 38 A.3d at 734. Nevertheless, it is difficult to perceive how such a holding is not merely symbolic or semantic in nature, particularly given the limited tools that have been developed in the case law since the present redistricting methodology was adopted in the 1968 Constitution. Indeed, the very mention of "outer limits" which the LRC may or may not "test," *Holt I*, 614 Pa. at 445–46, 38 A.3d at 761, invokes the language of discretion, *see id.* at 441, 38 A.3d at 758 (referencing the LRC's "discretionary task within the limits set by the Constitution"); Majority Opinion, at 414, 67 A.3d at 1231 (suggesting that there is "considerable discretionary authority reposed in the LRC" to perform its mission); *id.* at 407, 67 A.3d at 1236 (recognizing that protecting district lines may be honored as a discretionary matter within constitutional limitations), a concept that incorporates a range of permissible choices that are reasonable and non-arbitrary, and that subsumes deferential review

as an essential aspect. In short, the LRC's ability to exercise discretion implies a deferential standard of review. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) (referring to "deference" as "the hallmark of abuse-of-discretion review").[2]

In summary, the Court has only a few definable standards in reviewing a reapportionment plan, such as population deviation benchmarks and a strict contiguity requirement enforced except in the rarest of situations. Beyond that, alternate plans forwarded by challengers assist the Court to employ its intuitive judgment as to whether the LRC has "gone too far," and hence, abused its discretion. Whether or not we say deference is at work, the acknowledgement of discretion and the allocation of the burden of proof accord with the character of the exercise that lies at the heart of redistricting—which, as noted, is legislative and political.

---

**2.** Consistent with this notion of deference, if no challenge is filed, the plan automatically attains the force of law. *See* Pa. Const. art. II, § 17(e). Additionally, if a challenge is filed, the challenger bears the burden to establish that the plan is contrary to law. *See id.* § 17(d); *see also* Majority Opinion, at 402–03, 67 A.3d at 1229; *Holt I,* 614 Pa. at 375, 38 A.3d at 718 (referring to a challenger's "heavy burden" of establishing a plan's unlawfulness (quoting *Albert,* 567 Pa. at 685, 790 A.2d at 998)).